[No. 41664. En Banc. November 14, 1972.]

WASHINGTON KELPERS ASSOCIATION, *Respondent,* v. THE STATE OF WASHINGTON *et al., Appellants.*

*Slade Gorton, Attorney General,* and *William Lemke, Assistant,* for appellants.

*Neil Hoff,* for respondent.

*Max R. Nicolai,* amicus curiae.

NEILL, J.—Defendants State of Washington and the Director of Fisheries appeal from a judgment declaring RCW 75.12.650 unconstitutional and restraining the Department of Fisheries from enforcing the provisions of the statute.

RCW 75.12.650 provides:

> "Angling" or "personal use" gear, in accordance with the provisions of RCW 75.04.070, RCW 75.04.080, RCW 75.04.100 and under the authority set forth in RCW 75.08.080, is prohibited for commercial salmon fishing.

The effect of the legislation is to prohibit the use of sports gear for commercial salmon fishing.[1]

---

[1] Angling is defined in RCW 75.04.100 as follows:

"'Angling' means fishing for personal use with one line attached to a pole held in hand while landing the fish, or with a hand operated line

The record indicates that in 1969 there were nearly 2,800 commercial salmon fishing licenses issued by the Department of Fisheries. Approximately one-half of these licenses were commercial trolling licenses issued to fishermen using "angling" or sports gear rather than one of the various types of fixed trolling gear. Plaintiff is an association of these licensees who fish commercially with sports gear.

The trial court held that (1) RCW 75.12.650 is not a valid exercise of the police power in that it has no real or substantial relation to the objects stated to be accomplished by the Department of Fisheries; and (2) the statute discriminates within a class and violates both the state and federal constitutions.

In deciding the constitutional questions thus raised, it is necessary to view RCW 75.12.650 in the context of the comprehensive conservation and management programs for our salmon resource carried on by the state through the Department of Fisheries. Salmon in the waters of the state of Washington are a managed and protected resource from the time young salmon come out of their native spawning beds and move downstream to sea until the time they once again return from the ocean to these same beds to spawn their young and die. The Department of Fisheries' manage-

without rod or reel, to which may be attached not to exceed two single hooks, or one artificial bait with no more than four multiple hooks."

RCW 75.04.070 defines personal use and reads:

" 'Personal use'—The taking or possession of food fish or shellfish 'for personal use' means taking or fishing for food fish and shellfish by angling or by such other means and with such gear as the director may authorize for fishing for personal use, or possessing the same for the use of the person fishing for, taking, or possessing the same and not for sale or barter."

RCW 75.04.080 defines commercial purposes and reads:

" 'Commercial purposes'—The taking, fishing for, possession, processing, or otherwise dealing in or disposing of food fish and shellfish for 'commercial purposes' means taking or fishing for food fish with any gear unlawful for fishing for personal use, or taking or possessing the food fish and shellfish in excess of the limits permitted for personal use, or taking, fishing for, handling, processing, or otherwise disposing of or dealing in food fish with the intent of disposing of such food fish, shellfish, or parts thereof for profit, or by sale, barter, trade, or in commercial channels."

ment program is quite complex. The department protects and improves habitat by regulating the taking of gravel and diversion of water from streams, initiating stream improvement cleanup work to insure that streams are suitable for salmon, constructing fish ladders and other devices which open up miles of Washington's streams which would otherwise be inaccessible to salmon, and maintaining hatcheries for the artificial propagation of salmon. As salmon go to sea, the department observes them and the conditions that affect them and predicts the survival expected in the oncoming harvest.

As there is a limited supply of salmon and high competition for them, the department must have a complex set of regulations so that salmon will be properly protected and managed as they return through the various intensive fisheries and so that a proper escapement will be obtained. Regulations are based on the expected size of salmon runs and the department's knowledge of the effectiveness of various types of fishing gear and the corresponding effect on the returning fish.

The ocean fishery, which includes the sport fishery and the commercial troll fishery, is the most difficult to regulate because the department cannot tell whether a particular fish caught is from a limited stock or an abundant stock. Heavy fishing may overfish limited stocks of fish while exploiting more abundant stocks. It is necessary to limit the ocean catch so that overutilization can be corrected by management of other fishing areas as the fish move to their home streams.

As the various runs of salmon move inland from the ocean, they begin to separate. The department, when these conditions are known, can apply regulations allowing for higher catches on abundant stocks and more stringent regulations to protect those stocks of fish which are weak. If an ocean catch is not tightly regulated and managed, it is impossible to properly protect weak stocks of fish.

The department has three management tools that are used in the regulation of fisheries. These are (1) regulation

of the time of fishing, (2) the area of fishing, and (3) the type of gear that may be used for fishing.[2] Management of the total fishing effort has necessitated the enactment of different regulations for sport fishing and for commercial fishing. Basically, the sports fisheries are managed to allow large numbers of fishermen to take a limited number of fish. Lawful gear for angling is defined in RCW 75.04.100, *supra* footnote 1. Under the provisions of WAC 220-56-053 and WAC 220-56-066, most rivers, streams, and ocean areas are open to angling with varying possession and bag limits for different areas. For the coastal fishery, the limit is three salmon of not less than 20 inches in length. WAC 220-56-013. No license is presently required for angling, but sport catches must be recorded upon salmon punch cards, which are returned to the Department of Fisheries. Fish taken by angling are for personal use only and may not be sold commercially.

Commercial fisheries, on the other hand, are managed to allow for proper escapement and maximum commercial take. The legislature has established license requirements for all segments of the commercial fishery. Areas open to commercial fishing are set by statute (*see* RCW 75.18) and permanent regulations (*see* WAC 220-47-010 through WAC 220-47-070). The legislature has also defined lawful gear for the various classes of licenses.

RCW 75.12.650 was enacted by the legislature as a part of the management and regulatory scheme of the Department of Fisheries as outlined above. The state asserts that the statute, by prohibiting the use of sports gear for commercial fishing, improves the Department of Fisheries' ability to manage both the sport and commercial ocean fisheries and furthers the overall conservation goals of the department.

▮ In determining the constitutionality of RCW

---

[2] RCW 75.08.080 authorizes the Director of Fisheries to make rules and regulations concerning, among other things, the times and places for lawfully taking salmon, the types of gear that may be lawfully used in taking salmon, and the possession, disposal and sale of salmon.

75.12.650, we must remember that the state, in its sovereign capacity, owns the fish in the waters of the state. Fishermen have no private property rights in taking salmon. In regulating the fisheries, the state is merely enacting legislation concerning its own property and prescribing the methods which may be used in acquiring it by private persons.

In *Vail v. Seaborg,* 120 Wash. 126, 207 P. 15 (1922), the court was faced with a rule and order of the state fisheries board prohibiting the taking of salmon from Puget Sound during a specified period by any means except with hook and line. Complainants, gill-netters, claimed that they had an investment in their boats and appliances; that fishing was their only means of livelihood; and that the board's order would deprive them of their means of livelihood. A demurrer to the complaint was sustained on the following basis, on page 131:

> The food fish in the waters of the state belong to the people of the whole state, and the state through its legislature has the same right of regulation and control of this property that it has of any other state property. The fact that appellant and others are engaged in the business of taking fish does not give them any property in the fish prior to taking. The right exists in the state in the first place to say whether any fish whatever shall be taken. By the act in question the right to fish is provided for, but only under such regulations as shall be found by a properly constituted board to preserve and perpetuate the supply.

Later, in *McMillan v. Sims,* 132 Wash. 265, 231 P. 943 (1925), the court sustained a state fisheries board order establishing certain waters as a fish preserve, prohibiting operation of fish traps located therein, and prohibiting the taking of salmon from those waters except by hook and line. This court's opinion reviewed the rule of state authority in the regulation of its fishery resource, stating on page 268:

> Let us at the outset be reminded that in the regulation of and restrictions upon the taking of the fish from the waters of the state, the state is but dealing with its own property over which its control is as absolute as any other

owner has over his property. In *State v. Tice,* 69 Wash. 403, 125 Pac. 168, 49 L. R. A. (N. S.) 469, we said:

"The decisions of the courts in this country, so far as they have come to our notice, are all in unison in holding that there is no private right in the citizen to take fish or game, except as such right is either expressly or inferentially given by the state."

The *Vail* and *McMillan* cases were cited and their principles recently reaffirmed in *State v. Moses,* 79 Wn.2d 104, 113, 483 P.2d 832 (1971), where we referred to these cases for the proposition that

Fish, while in a state of freedom, are the property of the sovereign power in whose waters they may be. In the United States, it is the state and not the United States which is the sovereign power in whose waters the fish are, and the state owns the fish in its sovereign capacity as the representative of and for the benefit of all people in common. 36A C.J.S. *Fish* § 2 (1961). This state has affirmed the rule of state sovereign ownership over wild animals, wild birds, and fish freely swimming in this state's waters. *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P.2d 1101 (1936); *Judd v. Bernard,* 49 Wn.2d 619, 304 P.2d 1046 (1956); *Wiegardt v. State,* 27 Wn.2d 1, 175 P.2d 969 (1947); *McMillan v. Sims,* 132 Wash. 265, 231 P. 943 (1925); *Vail v. Seaborg,* 120 Wash. 126, 207 P. 15 (1922); *State v. Tice,* 69 Wash. 403, 125 P. 168 (1912).

■ Bearing in mind this broad discretion existing in the legislature as it protects and regulates the state's salmon resource, we turn to the specific constitutional defects in RCW 75.12.650 found by the trial court. It is a well established rule that one who attacks the constitutionality of a law has the burden of proof. *Frach v. Schoettler,* 46 Wn.2d 281, 285, 280 P.2d 1038 (1955). Also an act of the legislature is presumed to be constitutional and should not be declared invalid unless it is shown beyond a reasonable doubt to be so. *Reesman v. State,* 74 Wn.2d 646, 650, 445 P.2d 1004 (1968); *State v. Primeau,* 70 Wn.2d 109, 111, 422 P.2d 302 (1966).

■ We have often emphasized the broad scope of the state's police power, consistently approving of the follow-

ing language found in *Shea v. Olson,* 185 Wash. 143, 153, 53 P.2d 615, 111 A.L.R. 998 (1936):

> However difficult it may be to give a precise or satisfactory definition of "police power," there is no doubt that the state, in the exercise of such power, may prescribe laws tending to promote the health, peace, morals, education, good order and welfare of the people. Police power is an attribute of sovereignty, an essential element of the power to govern, and a function that cannot be surrendered. It exists without express declaration, and the only limitation upon it is that *it must reasonably tend to correct some evil or promote some interest of the state,* and not violate any direct or positive mandate of the constitution.

(Italics ours.) *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960), *cert. denied,* 364 U.S. 932 (1961). Moreover, every law is presumed to be in the interest of the public welfare. *Frach v. Schoettler, supra* at 285.

 The test, then, for determining whether RCW 75.12.650 is a valid exercise of the police power, is whether the statute has a reasonable and substantial relation to the accomplishment of some purpose fairly within the legitimate range or scope of the police power. Without exception, this court has found that the regulation of the salmon industry promotes the good order and welfare of the people of this state and is clearly within the legislative police power. *Barker v. State Fish Comm'n,* 88 Wash. 73, 152 P. 537 (1915); *Vail v. Seaborg, supra; McMillan v. Sims, supra; State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P.2d 24 (1935); *Frach v. Schoettler, supra.*

The precise objectives of RCW 75.12.650 are, as stated by representatives of the Department of Fisheries, to (1) make separate and distinct the sport and commercial fisheries and specifically to eliminate the abuse of purchasing a commercial license to circumvent sport catch limitations; (2) improve the policing of fishery violations and decrease the number of sport-caught fish illegally entering commercial channels; and (3) improve the management of the salmon industry. We believe each of these objectives to be

fairly within the legitimate scope of the police power, as part of the comprehensive conservation and management program carried on by the state.

We turn to the second criterion for validity of the statute under the police power, *i.e.*, whether RCW 75.12.650 bears a reasonable relationship to the accomplishment of these goals.

The trial court was presented with substantial evidence tending to establish a relationship between RCW 75.12.650 and the stated objectives of the statute. Prior to the enactment of RCW 75.12.650, persons fishing with sport angling gear could fish commercially by purchasing a troll line license. RCW 75.28.130. The record indicates that during the last 10 years the number of persons purchasing troll line licenses and fishing with sport angling gear has rapidly increased and created problems in management of the salmon fishery and enforcement of existing conservation laws.[3]

The Director and Assistant Director of the Department of Fisheries outlined at trial facts which would justify enactment of RCW 75.12.650. Both testified that RCW 75.12.650 was enacted to make sport and commercial ocean fisheries separate and distinct[4] and to improve enforcement of sport and commercial fishery rules and regulations.

The director described the problem of identification of sport and commercial fishermen which RCW 75.12.650 should correct:

[3]*State of Washington, Department of Fisheries, Supplemental Progress Report Marine Fisheries Research and Management 1967 Washington Troll Fleet Investigation* shows at page 23 that of the entire 1967 troll fleet of 2,372 boats, 948 were com-sport boats. Out of 885 boats licensed for the first time in 1967, 511 (57.7 percent) were com-sport boats and 135 (15.3 percent) were kelper boats. "Com-sport" refers to persons licensed for commercial salmon trolling who use vessels carrying no fixed gear. "Kelpers" refers to persons licensed for commercial trolling who use small boats and utilize both fixed gear and sport gear.

[4]Separation of the sport and commercial fisheries is not a concern limited to this state. Our sister state, Oregon, has for some years prohibited commercial fishing with sport gear by regulations similar to RCW 75.12.650. *See* ORS 509.230(2); Oregon Administrative Rule 20-100.

There are several factors that concern us. Number one, a man holding a troller's license can fish either commercially or sportswise. In other words, he wears two hats. As an illustration, our patrol boat might spot a vessel in a preserve which he recognizes as belonging to comsport, if I may use that term, and he will run over there to see what this commercial fisherman is doing in a preserve, and the holder of the troll license will say, "Well, I am not commercially fishing now; I am fishing sportswise."

The assistant director discussed the rapid growth of commercial fishing with sport gear and the problems this has created for the management of separate sport and commercial fisheries and enforcement of sport and commercial regulations:

In more recent years, I think coincidental with the development of really large dependable outboard engines and the larger sport fishing vessels with some seaworthy capacity, our sports fishery spread rapidly to the outside waters in large numbers, where formerly the sport fishery had been on inside sheltered waters. At this time the number of people buying commercial licenses who had formerly just been identified as sports fishermen began to increase, and reports began to come in from the field that the numbers were becoming such that we were losing control of our regulations because of the number and the ease with which these fishermen could slip from one fishery to the other. At the same time, we began to notice that there were large deliveries of fish entering commercial channels . . .

As I mentioned earlier, a limited resource, well, there are only so many fish, and they are under high demand. This stock has been under full exploitation for some years, meaning that the total allowable harvest was already being taken prior to the development or the recent growth of the com-sport group. As you add another catch factor to the management scheme you are working with, several things can happen. One, if you don't regulate to reduce the total catch along the line, then your spawning escapement will suffer and your subsequent production will go down. The next thing that can happen is that the new group will subtract from or actually take fish that are being harvested by the other groups that have al-

ready been established and recognized by law, and will take fish from those fisheries, and in this particular case, by being able to fish both as a sport fisherman and as a commercial troller, and with a rapidly growing group, they would be expected to convert the sport fishery into largely a fishery with commercial aspects, to the detriment of the sport and tourist industry of the state, and also as it competed more and more directly and grew in size and the catch had to be subtracted from . . .

Testimony further established that of 132 arrests in 1968 for commercial salmon violations, 60 were attributed to persons fishing commercially with sport fishing gear.

In his testimony, the director emphasized that management and conservation are synonymous terms:

Well, in the fishery management business, the terms "management" and "conservation" are synonymous. If you will read the literature which comes to us from other fisheries agencies, you will see that articles using the word "management" when they could very easily and more properly have used the word "conserve" or "conservation." Now, we can't conserve the fish unless we can properly manage it.

He further testified that RCW 75.12.650 made it possible for the department to obtain more accurate statistics on the sport and commercial catch and, thus, better regulate and manage the total salmon fishery and escapement.

█ Thus the trial court was presented with abundant evidence tending to connect RCW 75.12.650 to the objectives of the statute stated by the Department of Fisheries. In reviewing legislation challenged as being an invalid exercise of police power, we have consistently followed the rule set forth in *Shea v. Olson, supra* at 154:

In determining whether a law comes within the police power of the state, it is not incumbent upon the court to find that facts which would justify such legislation actually exist. If a state of facts which would justify the legislation can reasonably be conceived to exist, the court must presume that it did exist and that the law was passed for that purpose.

*Lenci v. Seattle,* 63 Wn.2d 664, 667, 388 P.2d 926 (1964);

*Markham Advertising Co. v. State,* 73 Wn.2d 405, 420, 439 P.2d 248 (1968). The trial court was presented with facts which can "reasonably be conceived to exist," and which demonstrate a reasonable and substantial relation between RCW 75.12.650 and a proper legislative purpose. We hold that RCW 75.12.650 is a valid exercise of the police power.

■ The trial court also concluded that RCW 75.12.650 discriminates within a class and violates both the state and federal constitutions. We have recognized that the state may classify its citizens for various purposes, treating some differently from others. In discussing class legislation, we said in *Clark v. Dwyer, supra* at 435:

Article I, § 12 of the state constitution and the fourteenth amendment to the Federal constitution, prohibiting special privileges and immunities and guaranteeing equal protection of the laws, require that *class legislation must apply alike to all persons within a class, and reasonable ground must exist for making a distinction between those within, and those without, a designated class.* Within the limits of these restrictive rules, the legislature has a wide measure of discretion, and its determination, when expressed in statutory enactment, cannot be successfully attacked unless it is manifestly arbitrary, unreasonable, inequitable, and unjust.

(Italics ours.) *Accord, State ex rel. O'Brien v. Towne,* 64 Wn.2d 581, 392 P.2d 818 (1964).

■■ Clearly, RCW 75.12.650 applies equally to all persons within the statutory class. The law prohibits the use of "angling" or "personal use" gear for all commercial salmon fishing, and everyone who comes within the provisions of RCW 75.12.650 by the buying of a commercial license and fishing for commercial purposes is affected in the same way. *State v. Tice,* 69 Wash. 403, 405, 125 P. 168 (1912); *Barker v. State Fish Comm'n,* 88 Wash. 73, 76-77, 152 P. 537 (1915); *McMillan v. Sims,* 132 Wash. 265, 270-71, 231 P. 943 (1925); *Frach v. Schoettler,* 46 Wn.2d 281, 286, 280 P.2d 1038 (1955).

We move, therefore, to the second requirement for validity of class legislation—the existence of a reasonable

ground for making a distinction between those who fall within the designated class and those who do not. A reasonable classification is one "which includes all [and only those] persons who are similarly situated with respect to the purpose of the law." Tussman & tenBroek, *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341, 346 (1949).

As noted above, RCW 75.12.650 was enacted to (1) make separate and distinct the sport and commercial fisheries and specifically to eliminate the abuse of purchasing a commercial license to circumvent sport catch limitations; (2) improve the policing of fishery violations and decrease the number of sport-caught fish illegally entering commercial channels; and (3) improve the management of the salmon fishery. We hold that the statutory class—all commercial fishermen—includes all and only those persons similarly situated with respect to the stated purposes of RCW 75.12.650; the classification is reasonable in light of its purpose.

Finally, this court has specifically rejected the contention that allowing only certain types of gear to be used for commercial fishing violates the equal protection clause of the federal constitution and article 1, section 12 of the state constitution. In holding that a prohibition against certain gill nets was not discriminatory, we stated in *Barker v. State Fish Comm'n*, 88 Wash. 73, 76, 152 P. 537 (1915):

It seems plain to us that this is not a discrimination between, or a classification of, persons; but only a discrimination as to appliances which may be used; and that as to each class of such appliances, every person may use them under exactly the same conditions and restrictions. There is no suggestion in the law that gill nets may not be used as the law prescribes by all persons, or that purse and drag seines may not be used as the law prescribes by all persons. There is plainly no discrimination touching any characteristic or quality attaching to the person of appellants or any other person.

It is suggested, however, that the economic burden of requiring conversion from sports gear to fixed gear is of paramount consideration in determining the constitution-

ality of RCW 75.12.650. There are no findings of fact before us relating to the economic impact of the statute. This is not surprising, in view of the indefinite testimony before the court on the cost of conversion to fixed gear. The Director of Fisheries estimated the cost of fixed gear for small boats to be about $60. One commercial fisherman estimated the cost of a two gurdy fixed gear to be approximately $300, with an electric gear setup as approximately $1,000. The Assistant Director of Fisheries presented as an exhibit an advertising brochure for a hand trolling gurdy specifying $58.58 as the complete listed cost.

■■■ But even assuming that the statute might have some material impact, this factor is for consideration during the legislative process, and has no relevance to the constitutionality of the enactment. In *Barker* the court upheld a law allowing the use of purse and drag seines of over 500 feet in length with meshes of "three inches stretch measure", while prohibiting gill nets of over 500 feet in length and with meshes of less than "five inches stretch measure." The complainants in that case contended that the statute would put them out of business and thereby deny to them privileges and immunities which it grants to others in violation of the state constitution, and would also deny to them equal protection of the laws, in violation of the Constitution of the United States. In discussing the impact on gill-netters, the court said:

> However, our conclusion would be the same in this case though we should regard the allegations of appellants' complaint as showing that the vocation of gill net fishing would be entirely destroyed by this law, in view of the fact that the state is thereby legislating concerning its own property and prescribing the methods which may be used in acquiring it by private persons.

*Barker v. State Fish Comm'n, supra* at 80.

Respondents also contend that RCW 75.12.650 is invalid because other less severe alternatives were available to the legislature. However, we have held that the wisdom of fishery regulations presents no judicial question. *McMillan*

*v. Sims, supra* at 271. We responded to a similar argument that the decision of the legislature was unwise in *Barker,* at page 80-81:

> Some argument seems to be made rested upon the allegations of the complaint which, if true, tend to show that the three-inch mesh permitted to be used in purse and drag nets is much more destructive to the fish than the five-inch mesh permitted to be used in gill nets. This argument might be appropriate to be addressed to the legislature. It possibly might be of some persuasive force as tending to show that the law is unwise, or even that it is unjust to the people of the state, but with that we have nothing to do. It might be all of that and still not be discriminatory as between persons. It would not for that reason grant privileges or immunities to one class and withhold them from another, which upon the same terms would not equally belong to all persons; nor would it deny to any person the equal protection of the laws.

It is for the legislature—not this court—to determine which means of solving a particular problem is most appropriate and consistent with the overall conservation and management scheme for the salmon resource of this state. The concern of the judiciary is only whether—considering the established presumptions accorded to legislation in this area—the regulation in question has a reasonable and substantial relation to a legitimate object of the police power, and does not violate any direct or positive mandate of the state or federal constitutions.

RCW 75.12.650 is a valid exercise of the police power and violates neither the equal protection clause of the fourteenth amendment to the United States Constitution nor article 1, section 12 of the state constitution.

The judgment of the trial court declaring RCW 75.12.650 to be unconstitutional is reversed. Remanded with directions to dismiss.

HAMILTON, C.J., FINLEY, STAFFORD, and UTTER, JJ., and SHORETT, J. Pro Tem., concur.

HUNTER, J. (dissenting)—I agree with the majority that the state has broad power in regulating the taking of

salmon for the purpose of preserving and enhancing the great salmon fishery resource of this state. The state's right and duty to accomplish this purpose cannot be questioned. The vital issue in this case, however, is whether the statute requiring the sports commercial fishermen to use more efficient equipment in the taking of salmon, and which is more destructive to the immature fish, has a reasonable and rational relationship to the objective of the preservation and conservation of the salmon fishery. The answer to me appears obvious on its face.

The record in this case clearly shows that this gear now required of sports commercial fishermen, by reason of RCW 75.12.650, is inconsistent with the accomplishment of the purpose of preservation of the salmon fishery.

We have a long history of legislation in this state limiting the manner and means of catching salmon, which has always been to make the taking of fish more difficult for the preservation of the salmon fishery, such as by the abolishment of fish traps, the regulation of the length and size of nets, and the size of the mesh to allow escapement of the immature fish, etc. But now for the first time the new theory has been evolved by the majority that the conservation of the salmon fishery can be better accomplished by requiring the sports commercial fishermen to equip their boats with gear that takes salmon more effectively and, in the process, is more destructive to the immature salmon.

The record in this regard contains the following which is not disputed.

Earl Holmstrom on direct:

Q. Now, sir, tell me this: How many lures would the average fixed-gear boat have out? Explain that. A. I didn't run too many. I would run up to eighteen, six on each line, and an outrigger, well, yeah, about up to twenty. Q. Up to twenty? A. Yeah. Q. Would that be the actual lures that would be out at one time? A. Yeah. Q. And the bigger boats, how many do they get? A. Probably forty or fifty. Q. Forty or fifty? A. Yes, all together, counting all the different dogs they have out. Q. All right. And sir, tell the Court your experience with respect to fish killed by using this rigging-type of fishing?

A. Well, there's no comparison. On your sport gear you know right now what you got, and you can bring him in and unhook him, but on heavy gear a lot of times you come in—you leave them out there until they load up, especially the silvers, until they load up, and then you bring them in. You have got shorts on there that are dead, and you just throw them away. You can't tell just by a straight pull on the gear.

Wilbur Barker on direct:

Q. And sir, can you tell this Court from your experience whether or not the wastage of fish is greater with fixed-gear than with the pole-type gear? A. This is an opinion on my part. I feel it is higher with fixed-gear, and the wastage is higher, from the standpoint of what we were speaking of yesterday, of dragging the fish through the water. I would like to say here in my testimony that I feel that not all fixed-gear fishermen pull their lines immediately, and I am talking about trollers now particularly, because in the common parlance in the fishing industry we practice what we call soaking a slug, and to explain that further to the Court I would like to say that when you are in these large Chinooks, large salmon, these fish are pretty wild when they are green, in other words, when they are first hooked, and in order to handle them properly at the boat it is sometimes necessary to drag them around for a while to actually tire them out, because you cannot handle them even on one hundred pound test leader and one hundred twenty-five pound test leader, they will break off if you reach for your snubber to pull them in that soon, so we don't always pull the fish right away. Also, in fishing in a good silver bite, it has been my observation while fishing out there with the fleet at times that the trollers do not always pull immediately on getting one strike. If the bite is good they are going to leave the lines out and load up as much as they can before they pull. I would just like to add that here in the testimony as far as dragging fish around goes. Q. When these vessels have the fixed-gear, do they use a heavier weight generally? A. Well, any type of fixed-gear requires a heavy weight to hold the line down, depending on how deep you are fishing, how many spreads are being run and so forth, but commonly twenty-five pound lead weight on the bottom is about a minimum that is run.

From this record, it is the duty of this court to hold there is no reasonable and rational relationship in the requirements of this statute and the conservation of the salmon fishery; that it constitutes an unreasonable exercise of the police power and should therefore be stricken down.

Not only is the effect of the statute destructive to the salmon resource, but it has a far-reaching and detrimental effect upon the sports commercial fishermen. The department admits the effect of this statute will be to reduce the number of commercial fishermen who now pursue this occupation of commercial fishing with sports gear. It is also clear from the record that the cost of converting from sports gear to fixed gear is considerable, which will force some commercial fishermen out of business, and that the risk and hazard of using fixed gear on the smaller boats, now adaptable to sports commercial fishing, is so great that others also will be forced out of business unless they are economically able to secure larger boats for the conversion. The drastic effect of this statute upon the ability of the sports commercial fisherman to stay in business in pursuing his occupation is therefore also of paramount consideration in determining the reasonableness of the new statute in the light of the purposes it purports to accomplish.

The defendants, the Department of Fisheries and the director, assert that large numbers of salmon are being taken by fishermen using sports or "angling" gear under a commercial trolling license without reporting these salmon on the punch cards used by sportsmen or on the receiving tickets used by commercial fishermen; that this prevents the Department of Fisheries from accumulating accurate catch data essential for the management of the salmon fishery, and that RCW 75.12.650 was enacted to correct this problem by making separate and distinct the sports and commercial fishery.

The record does not show this problem will be corrected by this statute except by a reduction of the number of sports fishermen engaged in commercial fishing. The records show that commercial fishermen, other than sports

commercial fishermen, can also abuse the requirements of statistical reporting by taking salmon for their personal use, by giving them away or by selling their catch in illegal channels. The evidence also shows there are over 450,000 sports fishermen and a significant number of these fishermen do not return their punch cards to the department, thereby failing to indicate the number of salmon they have caught. I believe that the ineffectiveness of this drastic statute, in accomplishing better statistical reporting, fails to meet the test of reasonableness and to have a rational relation to the correction of the evil intended.

The defendants further assert that fishermen possessing a commercial trolling license, who fish in restricted areas or water open to sport salmon fishing only, using "angling" gear, obtain an unfair advantage over other sports fishermen because they are able to exceed the bag limit imposed upon sports fishermen (three fish per day). This assumes that substantially all sports commercial fishermen will disobey the law by exceeding the bag limit for sports fishermen while fishing as sports fishermen in restricted waters. This is unfair to sports commercial fishermen who do obey the law. I agree with the Washington Kelpers Association (plaintiff) that the severe effects of this statute, for the correction of this purported abuse by some sports commercial fishermen, are unreasonable when other alternatives less drastic are available for correcting this purported abuse.

The defendants argue, however, that the sports commercial fishermen wear two hats, one as a sports fisherman and the other as a commercial fisherman; that they fish in restricted waters as sports fishermen in which fixed gear commercial fishermen may not fish commercially, as well as in the nonrestricted areas. The record does not support this argument. Fixed gear fishermen have the same opportunity to fish as sports fishermen in waters closed to commercial fishermen, as do commercial sports fishermen as long as they fish only with sports gear. It is implicit from the record, however, that the fixed gear fishermen do not fish as sports

fishermen in the closed areas for the obvious reason that a greater take of salmon results with the more efficient fixed gear in the nonrestricted areas.

A conversion of sports commercial fishermen to more efficient fixed gear would thus result in the former sports commercial fishermen likewise staying out of the restricted areas in order to utilize the more efficient gear for the taking and harvesting of a greater number of salmon than by the use of sports gear in the restricted area which, in any event, is limited by law to the taking of three fish per day.

The defendants further contend it is difficult to identify the sports commercial fishermen; that the statute will make identification less difficult, resulting in more efficient enforcement of sports fishing regulations, and in managing the commercial fishing. I agree with the plaintiff that this is not a reasonable and appropriate regulation for the protection and conservation of the salmon fishery. The mere fact that such regulation aids in the identity of commercial boats or aids in the gathering of statistics cannot justifiably convert such a regulation into a valid exercise of police power, which is so detrimental to the sports commercial fishermen, when other reasonable alternatives for identification of a sports commercial fishing boat are obviously available.

Furthermore, as contended by the plaintiff, there is no showing in the record that the commercial fishing for salmon by the use of sports gear is in itself detrimental to the conservation and protection of the salmon fishery. On the other hand, as heretofore stated, it is implicit from the record that by requiring a conversion from "angling" or "personal use" gear to more effective and efficient fixed gear would result in a greater take of mature salmon and a greater destruction of immature salmon; and that such a regulation is not only unreasonable and inappropriate, but is inconsistent with the conservation of the salmon resource.

Again, we should be mindful of the gross discriminatory

effect of this statute on those fishermen using "angling" gear. As previously discussed, the real effect of this statute is to force out of business many sports commercial fishermen using "angling" gear. Such discrimination detrimentally affecting members of the commercial fishery class, without any reasonable or appropriate justification for such act, transcends the bounds of legitimate police power, and is in contravention of the equal protection and privilege and immunities provisions of our state and federal constitutions.

I cannot reasonably conceive from this record a state of facts to justify the required conversion of sports gear to fixed gear for commercial fishing to accomplish the objective intended by the statute, the conservation of the salmon fishery.

The judgment of the trial court should be affirmed.

ROSELLINI and HALE, JJ., concur with HUNTER, J.

Petition for rehearing denied December 22, 1972.