[No. 46019.   En Banc.   October 25, 1979.]

YAKIMA COUNTY DEPUTY SHERIFF'S ASSOCIATION, *Respondent,* v. THE BOARD OF COMMISSIONERS FOR YAKIMA COUNTY, ET AL, *Appellants.*

*Jeffrey C. Sullivan,* for appellant.

*David A. Thorner, Craig L. Smith,* and *Thorner, Kennedy & Gano, P.S.,* for respondent.

*Maureen J. Dightman* on behalf of Association of Washington Cities and *Robert E. Beaty* on behalf of Washington Association of Counties, amici curiae.

*Slade Gorton, Attorney General,* and *Richard A. Heath* and *James K. Pharris, Assistants.*

BRACHTENBACH, J.—This case concerns the applicability of certain provisions of the Public Employees' Collective Bargaining Act (PECBA), RCW 41.56, to Yakima County deputy sheriffs. Some background is necessary to put the precise issue in context.

PECBA was enacted in 1967, as then–Governor Evans explained when executing a partial veto,

> to promote the continued improvement of the relationship between public employers and their employees by providing a uniform basis for implementing the right of public employees to join labor organizations of their own choosing and to be represented by such organizations in matters concerning their employment relations with public employers.

Laws of 1967, 1st Ex. Sess., ch. 108, p. 1891. In 1973, the Act was amended in part by the addition of provisions for mandatory mediation, fact–finding and binding arbitration for "uniformed personnel." RCW 41.56.030(6); .430–.490; .905; .910.

"Uniformed personnel" are defined by RCW 41.56.030(6) as "law enforcement officers . . . of cities with a population of fifteen thousand or more or law enforcement officers employed by the governing body of AA counties". An AA county has a population of 500,000 or more. RCW 36.13-.010. King County is currently this state's only AA county. A first class county has a population of 125,000 but less than 210,000. RCW 36.13.010. Yakima County fits in this category.

The Yakima County Deputy Sheriff's Association (deputy sheriffs) brought this declaratory action to challenge as unconstitutionally underinclusive RCW 41.56.030(6)'s classification of "uniformed personnel" by population. The trial court held that the deputy sheriffs' equal protection rights were violated by RCW 41.56.030(6)'s population classification. It then struck the challenged language from the statute, thereby extending the act to all law enforcement personnel. We accepted direct review under RAP 4.2.

The precise issue here, therefore, is whether the exclusion of non–AA county deputy sheriffs from PECBA's mandatory mediation, fact–finding and arbitration provisions violates the Equal Protection Clause of the federal Fourteenth Amendment and the Privileges and Immunities Clause of the state constitution (Const. art. 1, § 12). We hold that it does not and reverse.

We begin by ascertaining the challenged legislative classification. RCW 41.56.030(6) creates a class of "uniformed personnel", *i.e.*, law enforcement officers employed by AA counties or cities with at least a 15,000 population. Thus, the challenged class in this lawsuit is that of law enforcement officers statutorily designated as "uniformed personnel." Respondent deputy sheriffs are law enforcement officers outside this class.

The deputy sheriffs do not contend, nor did the trial court find, that the deputies are part of a suspect class or that they have a fundamental right to mandatory mediation, fact–finding and arbitration. Therefore, we examine the legislature's decision to classify certain law enforcement officers as "uniformed personnel" with minimal rather than strict scrutiny. *Nielsen v. Washington State Bar Ass'n,* 90 Wn.2d 818, 820, 585 P.2d 1191 (1978).

There is some confusion in our cases about the requirements of minimal scrutiny. In some cases, we seem only to examine whether the challenged classification rests upon grounds that reasonably constitute a distinction between those within and without the class. *State v. Ruzicka,* 89 Wn.2d 217, 231, 570 P.2d 1208 (1977); *In re Ballot Title for Initiative 333,* 88 Wn.2d 192, 194, 558 P.2d 248, 559 P.2d 562 (1977); *Gluck v. Employment Security Dep't,* 84 Wn.2d 316, 318, 525 P.2d 768 (1974). In other cases, we seem to be concerned only that the classification have some rational relation to the legislation's purpose. *Seattle v. Buchanan,* 90 Wn.2d 584, 592, 584 P.2d 918 (1978); *In re Patterson,* 90 Wn.2d 144, 149–50, 579 P.2d 1335 (1978); *Houser v. State,* 85 Wn.2d 803, 807, 540 P.2d 412 (1975). Finally, in some cases, we claim to use a

"rational relationship" test, but then only look for "reasonable grounds." *Willard v. Department of Social & Health Servs.,* 91 Wn.2d 759, 763, 592 P.2d 1103 (1979); *Griffin v. Department of Social & Health Servs.,* 91 Wn.2d 616, 627, 590 P.2d 816 (1979); *Childers v. Childers,* 89 Wn.2d 592, 604–05, 575 P.2d 201 (1978).

In fact, three steps are involved when measuring the constitutionality of a legislative classification with minimal scrutiny. Underlying this scrutiny is the notion that the party challenging the classification has the heavy burden of overcoming the presumption of a statute's constitutionality. *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 528, 520 P.2d 162 (1974).

First, does the classification apply alike to all members within the designated class? *In re George,* 90 Wn.2d 90, 94, 579 P.2d 354 (1978); *Everett v. Fire Fighters, Local 350,* 87 Wn.2d 572, 576, 555 P.2d 418 (1976). The answer is usually yes. *Washington Kelpers Ass'n v. State,* 81 Wn.2d 410, 421, 502 P.2d 1170 (1972); *Belancsik v. Overlake Memorial Hosp.,* 80 Wn.2d 111, 115, 492 P.2d 219 (1971); *State ex rel. Bacich v. Huse,* 187 Wash. 75, 81, 59 P.2d 1101 (1936). However, an affirmative answer to this narrow question does not itself mean that the challenged legislative classification will survive minimal scrutiny. *See* L. Tribe, *American Constitutional Law* 994–95 (1978); Tussman & tenBrock, *The Equal Protection of the Laws,* 37 Cal. L. Rev. 341, 345 (1949).

Second, does some basis in reality exist for reasonably distinguishing between those within and without the designated class? More specifically, do reasonable grounds exist to support the classification's distinction between those within and without the class? *Crane Towing, Inc. v. Gorton,* 89 Wn.2d 161, 174, 570 P.2d 428 (1977); *Clark v. Dwyer,* 56 Wn.2d 425, 435, 353 P.2d 941 (1960), *cert. denied,* 364 U.S. 932, 5 L. Ed. 2d 365, 81 S. Ct. 379 (1961). The legislature's discretion in making classes is wide and, when a statutory classification is challenged, facts are presumed sufficient to justify it. *Moran v. State,* 88 Wn.2d

867, 874, 568 P.2d 758 (1977). The burden is on the challenger to prove that the classification does not rest on a reasonable basis. *Haddenham v. State,* 87 Wn.2d 145, 150, 550 P.2d 9 (1976).

Third, does the challenged classification have any rational relation to the purposes of the challenged statute? *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation,* 439 U.S. 463, 501, 58 L. Ed. 2d 740, 99 S. Ct. 740, 762 (1979). More specifically, does the difference in treatment between those within and without the designated class serve the purposes intended by the legislation? *Salstrom's Vehicles, Inc. v. Department of Motor Vehicles,* 87 Wn.2d 686, 694, 555 P.2d 1361 (1976); *Sonitrol Northwest, Inc. v. Seattle,* 84 Wn.2d 588, 589–90, 528 P.2d 474 (1974); *see* 3 B. Schwartz, *A Commentary on the Constitution of the United States* 500–04 (1968); *Developments in Law—Equal Protection,* 82 Harv. L. Rev. 1065, 1082–87 (1969). The challenger must do more than merely question the wisdom and expediency of the statute. *Brewer v. Copeland,* 86 Wn.2d 58, 61, 542 P.2d 445 (1975). The challenger must show conclusively that the classification is contrary to the legislation's purposes. *State v. Kent,* 87 Wn.2d 103, 110, 549 P.2d 721 (1976). Moreover, it must be remembered that equal protection does not require a state to attack every aspect of a problem. Rather, the legislature is free to approach a problem piecemeal and learn from experience. *State v. Kent, supra* at 111.

■ With these presumptions and principles at hand, we now consider whether the deputy sheriffs' equal protection rights are offended by RCW 41.56.030(6)'s classification of certain law enforcement officers as "uniformed personnel." The deputy sheriffs do not claim that the classification applies differently to members of the designated class. RCW 41.56.030(6) applies evenly to all "uniformed personnel" as defined, and the statute, therefore, satisfies the test's first step.

The second step demands that reasonable grounds exist for distinguishing between those within and without the

designated class. The only AA county in the state—and thus the only county employing "uniformed personnel"—is King County. Because King County is twice as large as any other county, it is presumed that a real difference exists between its law enforcement and public employee concerns and those of other smaller counties. The deputy sheriffs fail to overcome the presumption that sufficient facts support this distinction.

Moreover, county and city law enforcement agencies, even if both serve populations over 15,000, differ in function and structure. *Compare* RCW 35 *with* RCW 36. For example, county sheriffs usually are elected, while police chiefs usually are appointed. *Compare* RCW 35.23.130 *with* RCW 36.16.030. However, in King County, the chief law enforcement officer is appointed. King County Code § 2.16.090. County deputy sheriffs are law enforcement officers in primarily rural unincorporated areas, while city police enforce the law in primarily urban areas. The roles, responsibilities and problems of county law officers truly can differ from those of city police officers, and RCW 41.56.030(6)'s classification of certain of those officers as "uniformed personnel" is reasonable. *Cf. Jenkins v. State,* 85 Wn.2d 883, 890, 540 P.2d 1363 (1975) (no reasonable ground for distinguishing counties from other governmental entities for tort claims limitation).

The third step asks whether the classification has any rational relation to the purposes of the challenged statute. The deputy sheriffs argue that RCW 41.56.030(6)'s distinction between "uniformed personnel" and other law enforcement officers is irrational because it does not advance PECBA's goal of promoting a healthy employment relationship between public employers and public employees. In particular, the deputies contend that RCW 41.56.030(6)'s distinction is irrational in light of PECBA's general preamble, RCW 41.56.010,[1] and the preamble to the 1973 "uni-

---

[1] RCW 41.56.010 states:

formed personnel" amendments, RCW 41.56.430.[2]

The deputies' argument is not convincing. PECBA's general preamble never promises mediation, fact–finding and binding arbitration for all public employees, much less all law enforcement officers. The 1973 preamble's goal of "an effective and adequate alternative means of settling disputes" is limited specifically to "uniformed personnel" and has no application to the general class of all law enforcement officers.

Moreover, the deputy sheriffs' argument is really a complaint about the legislature's wisdom in classifying only law enforcement officers of AA counties and of cities with at least 15,000 populations as "uniformed personnel." They do not show conclusively why this classification does not serve PECBA's purpose of promoting a healthy relationship between public employers and public employees.

In *State ex rel. O'Brien v. Towne,* 64 Wn.2d 581, 583, 392 P.2d 818 (1964), it was said:

> Classifications of cities, counties and other legal subdivisions of states upon the basis of population, have been almost universally upheld by the courts, both state and federal, when population bears any reasonable relation to the purpose and subject matter of the given legislation.

The classification of law officers of certain–sized counties and cities as "uniformed personnel" is related to the goals of PECBA. While strikes by public employees may offend

---

"The intent and purpose of this chapter is to promote the continued improvement of the relationship between public employers and their employees by providing a uniform basis for implementing the right of public employees to join labor organizations of their own choosing and to be represented by such organizations in matters concerning their employment relations with public employers."

[2]RCW 41.56.430 states:

"The intent and purpose of this 1973 amendatory act is to recognize that there exists a public policy in the state of Washington against strikes by uniformed personnel as a means of settling their labor disputes; that the uninterrupted and dedicated service of these classes of employees is vital to the welfare and public safety of the state of Washington; that to promote such dedicated and uninterrupted public service there should exist an effective and adequate alternative means of settling disputes."

public policy and may create serious problems, the legislature in its discretion may experiment with a solution and strike at the harm only where it thinks it most acute.

We hold that the exclusion of respondents, who are employed by a non–AA county, from PECBA's mandatory mediation, fact–finding and arbitration provisions is not an equal protection violation.

Reversed.

UTTER, C.J., ROSELLINI, WRIGHT, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., and HAMILTON, J. Pro Tem., concur.

UTTER, C.J. (concurring)—I join in the judgment and analysis of the court, and concur solely to further explore a legal doctrine relied upon by the majority. In analyzing the merits of the equal protection issue presented in this case, the majority states that "the party challenging the [legislative] classification has the heavy burden of overcoming the presumption of a statute's constitutionality." It is significant that the statute challenged in this case is, in fact, an economic statute, and that the case authority cited by the majority as support for this principle—*Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 520 P.2d 162 (1974)—also concerned an equal protection challenge to an economic statute. The presumption of constitutionality applies with far greater force to economic statutes than to statutes which affect personal civil liberties.

The presumption of constitutionality has long been an established legal doctrine. As early as 1838, the United States Supreme Court declared that there is a "presumption" that a legislative body did not intend "to exercise or usurp any unconstitutional authority . . ." *United States v. Coombs,* 37 U.S. (12 Pet.) 72, 76, 9 L. Ed. 1004, 1006 (1838). We similarly observed in *State v. Bowen & Co.,* 86 Wash 23, 27, 149 P. 330, 331 (1915), *appeal dismissed,* 242 U.S. 655, 61 L. Ed. 547, 37 S. Ct. 12 (1916), that, in determining

the constitutionality of a legislative enactment, "[e]very possible presumption is in favor of the validity of the statute . . ." This legal rule is founded upon the separation of powers principle, and reflects judicial deference for the actions of the legislative branch of government. *See Salstrom's Vehicles, Inc. v. Department of Motor Vehicles,* 87 Wn.2d 686, 690–91, 555 P.2d 1361, 1365 (1976). *State v. Bowen & Co., supra.*

The degree of presumptive validity to be accorded a legislative enactment varies according to the type of statute. For example, a presumption of constitutionality does not attach at all to statutes which affect civil rights that are protected under the First Amendment. *See, e.g., Adams v. Hinkle,* 51 Wn.2d 763, 768–69, 322 P.2d 844, 848 (1958). Indeed, this court has held that any statute which imposes restraints on First Amendment rights "'comes into court bearing a heavy presumption *against* its constitutionality.'" *State v. Conifer Enterprises, Inc.,* 82 Wn.2d 94, 99, 508 P.2d 149, 152 (1973). The role of the presumption of constitutionality in equal protection cases is, however, more complex. A full definition of that role requires an examination of the judiciary's application of the presumption under both the traditional and "new" equal protection analyses.

In applying traditional equal protection analysis, the United States Supreme Court recognized that a presumption of constitutionality applies to legislative classifications. *See, e.g., Madden v. Kentucky,* 309 U.S. 83, 88, 84 L. Ed. 590, 593, 60 S. Ct. 406, 408, 125 A.L.R. 1383 (1940); *Middleton v. Texas Power & Light Co.,* 249 U.S. 152, 157–58, 63 L. Ed. 527, 531, 39 S. Ct. 227, 229 (1919). The court made clear, however, that particular deference must be shown to legislative regulation of business and economic activity, and therefore that a particularly heavy presumption of constitutionality must be given to economic statutes. *See, e.g., Madden v. Kentucky, supra; Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 55 L. Ed. 369, 377, 31 S. Ct. 337, 340 (1911). *See also Developments in the Law— Equal Protection,* 82 Harv. L. Rev. 1065, 1083 (1969).

When the United States Supreme Court fashioned its new 2-tier approach to equal protection in the 1960's, *see* G. Gunther, *Cases and Materials on Constitutional Law* 658-59 (9th ed. 1975), it incorporated the presumption of constitutionality into its lower-level test of minimal scrutiny. The court explained that this minimal rationality test begins with the principle that "[s]tate legislatures are presumed to have acted within their constitutional power . . ." *McGowan v. Maryland,* 366 U.S. 420, 425, 6 L. Ed. 2d 393, 399, 81 S. Ct. 1101, 1105 (1961). This presumption of constitutionality does not apply at all under the upper-level test of strict scrutiny: statutes which affect constitutionally protected fundamental rights or suspect classifications do not enjoy such a presumption of constitutionality. *See, e.g., Becker v. Levitt,* 489 F.2d 1087, 1091 (2d Cir. 1973), *cert. denied,* 416 U.S. 985, 40 L. Ed. 2d 762, 94 S. Ct. 2388 (1974).

In fashioning the new 2-tier test of equal protection, the court maintained its traditional deference for economic legislation. *See* G. Gunther, *supra* at 667. Accordingly, the court refined the minimal rationality test so as to apply a particularly heavy presumption of constitutionality to statutes affecting economic matters. *See, e.g., McGowan v. Maryland,* 366 U.S. 420, 425-26, 6 L. Ed. 2d 393, 399, 81 S. Ct. 1101, 1105 (1961). This heavier presumption of constitutionality for economic statutes is also evident in recent equal protection decisions of the United States Supreme Court. In *New Orleans v. Dukes,* 427 U.S. 297, 49 L. Ed. 2d 511, 96 S. Ct. 2513 (1976), the court considered an equal protection challenge to a New Orleans ordinance which prohibited push-cart operators from carrying on a vending business in the French Quarter of the city unless they had operated in the Quarter for at least 8 years. A push-cart operator who had carried on a vending business in the Quarter for only 2 years challenged the ordinance on equal protection grounds. After first identifying the ordinance as "solely an economic regulation", the court held that the ordinance did not violate equal protection, and explained:

When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. . . . Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions *presume the constitutionality* of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers . . .

(Italics ours.) *New Orleans v. Dukes,* 427 U.S. 297, 303, 49 L. Ed. 2d 511, 516–17, 96 S. Ct. 2513, 2516–17 (1976). The court also took the opportunity to expressly overrule its earlier decision in *Morey v. Doud,* 354 U.S. 457, 1 L. Ed. 2d 1485, 77 S. Ct. 1344 (1957), "the only case in the last half century to invalidate a wholly economic regulation solely on equal protection grounds . . ." *New Orleans v. Dukes,* 427 U.S. 297, 306, 49 L. Ed. 2d 511, 518, 96 S. Ct. 2513, 2518 (1976).

In *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 35 L. Ed. 2d 351, 93 S. Ct. 1001 (1973), *rehearing denied,* 411 U.S. 910, 36 L. Ed. 2d 200, 93 S. Ct. 1523 (1973), the court rejected an equal protection challenge to the Illinois personal property taxation scheme. Quoting from its earlier decision in *Madden v. Kentucky, supra,* the court declared that in taxation cases, "[t]here is a presumption of constitutionality which can be overcome 'only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.'" *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 35 L. Ed. 2d 351, 358, 93 S. Ct. 1001, 1006 (1973). The decisions of the United States Supreme Court thus recognize that, in according presumptive validity to legislative enactments, a stronger presumption of constitutionality attaches to statutes regulating economic matters than to statutes affecting personal civil liberties. *Cf. Usery v. Turner Elkhorn Mining Co.,* 428 U.S.

1, 15, 22–24, 49 L. Ed. 2d 752, 766, 770–71, 96 S. Ct. 2882, 2892, 2895–96 (1976) (holding that, in the due process context, a far stronger presumption of constitutionality applies to economic statutes than to statutes affecting personal civil liberties such as the right to retain custody of one's children, even when these civil liberties do not rise to the status of constitutionally protected "fundamental rights").

The particularly heavy presumption of constitutionality accorded economic statutes is also apparent in the decisions of this court. In *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 528, 520 P.2d 162, 166 (1974), we considered an equal protection challenge to the Life and Disability Insurance Guaranty Association Act. Upholding the constitutionality of the act, we stated that:

> [One] limitation upon our exercise of judicial review is the heavy presumption of constitutionality accorded a legislative act. . . . A statute's alleged unconstitutionality must be proven "beyond all reasonable doubt" before it may be struck down.

Subsequently, in *Salstrom's Vehicles, Inc. v. Department of Motor Vehicles, supra,* we explained that a particularly heavy presumption of constitutionality was applied in *Aetna Life* precisely because the challenged statutory provisions concerned economic matters. Quoting from the discussion of the presumption of constitutionality in *Aetna Life,* we explained in *Salstrom's Vehicles* that the principles involved were "the principles applicable to constitutional attacks on economic and business regulations". *Salstrom's Vehicles, Inc. v. Department of Motor Vehicles,* 87 Wn.2d 686, 690, 555 P.2d 1361, 1365 (1976). In *Salstrom's Vehicles,* as in *Aetna Life,* we applied the heavy presumption of constitutionality to a statute regulating business activities, and concluded that the statute conformed to equal protection requirements.

The challenged statute in the instant case concerns mandatory mediation and arbitration for public employees and

therefore is properly classified as a statute regulating economic matters. *Cf. Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 49 L. Ed. 2d 752, 766, 96 S. Ct. 2882, 2892 (1976). The decision of the court today reflects the principle that in equal protection cases, a particularly heavy presumption of constitutionality is reserved for economic statutes.

HICKS, J., concurs with UTTER, C.J.

Reconsideration denied January 11, 1980.