[No. 42757.    En Banc.    March 21, 1974.]

AETNA LIFE INSURANCE COMPANY *et al., Appellants,* v.
WASHINGTON LIFE AND DISABILITY INSURANCE
GUARANTY ASSOCIATION *et al.,*
*Respondents.*

*Bogle, Gates, Dobrin, Wakefield & Long* and *Ronald T. Schaps, John C. Coughenour,* and *Michael S. Courtnage,* for appellants.

*Carney, Stephenson, Siqueland, Badley & Smith,* by *Basil L. Badley* and *Milton C. Smith,* for respondent Washington Life and Disability Insurance Guaranty Association.

*Trethewey & Brink, Daniel Brink* and *Brian A. Putra,* for respondent Herrmann.

*Slade Gorton, Attorney General,* and *Thomas Carr, Assistant,* amicus curiae.

UTTER, J.—This is an action by nine life insurance companies, organized under laws of states other than Washington, challenging the constitutionality of the Washington Life and Disability Insurance Guaranty Association Act, RCW 48.32A, and the assessments levied thereunder in 1972 for the purpose of paying claims of policyholders of the Federal Old Line Insurance Company (FOL).

The trial court found that the guaranty association act was constitutional on its face and as applied. Appellants perfected an appeal directly to this court, and from the 85 findings of fact and conclusions of law make 54 assignments of error.

We affirm the action of the trial court.

Appellants are "foreign"[1] insurance companies, authorized to issue life insurance policies, disability insurance policies and annuity contracts within the state of Washington. The respondent, Washington Life and Disability Insurance Guaranty Association, is a nonprofit association created pursuant to the Washington Life and Disability Insurance Guaranty Association Act, RCW 48.32A. The Washington State Insurance Commissioner, as statutory receiver for FOL, appears as respondent-intervenor.

The purpose of the Guaranty Association, in part, is to accumulate funds arising from assessments upon all insurers authorized to transact life or disability insurance business in the state of Washington. These are used to assure the performance of contractual insurance obligations of insurers becoming insolvent to residents of this state. RCW

---

[1] RCW 48.32A.020(2).

48.32A.010. All insurance companies authorized to do business in Washington, whether foreign or domestic, are required by RCW 48.32A to be and remain members of respondent Guaranty Association as a condition to their authority to transact life and disability insurance business in Washington.

The Guaranty Association interpreted RCW 48.32A to apply to the claims asserted against and policies issued by FOL, a domestic insurer ordered in federal district court into liquidation on November 10, 1971. The guaranty association act had become effective on May 21, 1971, 6 months prior to the liquidation order. On March 1, 1972, the Guaranty Association issued assessments against all insurance companies authorized to do life and disability insurance business in Washington in 1970. These assessments, totaling approximately 2.6 million dollars, were for the purpose of honoring FOL policy claims.

All policies and contracts of FOL upon which the assessments here were based were issued in the state of Washington. The assessments were upon premiums earned in Washington and received by insurance companies authorized to do life insurance business in Washington during 1970. Each of the appellants transacted life and disability insurance business in Washington prior and subsequent to the Guaranty Association's effective date.

Broadly speaking, appellants' arguments center principally upon four constitutional principles. These are provisions dealing with equal protection of the law,[2] due process of law[3] prohibiting formation of corporations by special laws,[4] and prohibiting giving or lending the state's credit to a private party or taxing for a private purpose.[5]

---

[2]Const. art. 1, § 12; U.S. Const. amend. 14, § 1.

[3]Const. art. 1, § 3; U.S. Const. amend. 14, § 1.

[4]Const. art. 11, § 10 (amendment 40); art. 12, §§ 1, 5.

[5]Const. art. 7, § 5; *State ex rel. Reclamation Bd. v. Clausen*, 110 Wash. 525, 188 P. 538, 14 A.L.R. 1133 (1920).

# I
## Equal Protection

Appellants claim that they, as foreign insurers, are not treated equally with domestic insurers in every instance under the act. We agree,[6] but such a showing, without more, does not entitle appellants to the judicial review by this court of this legislative act. Appellants argue that the act disadvantages them more than necessary to accomplish the result desired by the legislature, and the National Association of Insurance Commissioners' "Model Act" is offered as an example of what, in appellants' view, the act before us ought to be. This approach misapprehends the limits which constitutional principles place upon this court's exercise of judicial review.

◼ Where the constitutionality of a legislative act is before this court, we are bound "to lay the article of the Constitution which is invoked beside the statute which is challenged and to decide whether the latter squares with the former." *United States v. Butler,* 297 U.S. 1, 62, 80 L. Ed. 477, 56 S. Ct. 312, 102 A.L.R. 914 (1936); *Spokane Methodist Homes, Inc. v. Department of Labor & Indus.,* 81 Wn.2d 283, 501 P.2d 589 (1972). This is not, however, the

---

[6]*Compare* "[The act applies] [t]o all . . . policies and contracts of a *domestic insurer,* without regard to the place of residence *or* domicile of the policy or contract owner . . ." (Italics ours.) RCW 48.32A.020(1).

"[The act applies] [t]o all . . . policies and contracts of a *foreign or alien insurer* . . . of which the policy or contract owner . . . is a resident of *and* domiciled within this state." (Italics ours.) RCW 48.32A.020(2).

"The association shall . . . assume, reinsure, or guarantee the performance of the policies and contracts of any *domestic* life or disability insurer . . ." RCW 48.32A.060(1). However, as to a *foreign* insurer, "[t]he association shall make or cause to be made payment of the death, endowment, or disability insurance or annuity benefits *due* under the terms of each policy or contract . . . issued or assumed by a foreign or alien insurer . . ." (Italics ours.) but the association is not obliged to assume the executory insurance contracts of an insolvent foreign insurance company. RCW 48.32A.060(2).

Also, RCW 48.32A.040(2) requires that a majority of the association's board of directors be domestic insurers.

exercise of a substantive power to review and nullify acts of the legislature apart from passing on their constitutionality, for no such substantive power exists. We are not a super legislature. "This court neither approves nor condemns any legislative policy. Its delicate and difficult office is to ascertain and declare whether the legislation is in accordance with, or in contravention of, the provisions of the Constitution; and, having done that, its duty ends." *United States v. Butler, supra. Hammack v. Monroe St. Lumber Co.,* 54 Wn.2d 224, 339 P.2d 684 (1959).

■ Another limitation upon our exercise of judicial review is the heavy presumption of constitutionality accorded a legislative act. *Middleton v. Texas Power & Light Co.,* 249 U.S. 152, 63 L. Ed. 527, 39 S. Ct. 227 (1919); *Madden v. Kentucky,* 309 U.S. 83, 84 L. Ed. 590, 60 S. Ct. 406, 125 A.L.R. 1383 (1940); *Frach v. Schoettler,* 46 Wn.2d 281, 280 P.2d 1038, *cert. denied,* 350 U.S. 838, 100 L. Ed. 747, 76 S. Ct. 75 (1955). Every state of facts sufficient to sustain a classification which reasonably can be conceived of as having existed when the law was adopted will be assumed. *Crescent Cotton Oil Co. v. Mississippi,* 257 U.S. 129, 66 L. Ed. 166, 42 S. Ct. 42 (1921); *Washington Kelpers Ass'n v. State,* 81 Wn.2d 410, 502 P.2d 1170 (1972). A statute's alleged unconstitutionality must be proven "beyond all reasonable doubt" before it may be struck down. *Ogden v. Saunders,* 25 U.S. (12 Wheat.) 135, 6 L. Ed. 606 (1827); *Alabama Federation of Labor v. McAdory,* 325 U.S. 450, 89 L. Ed. 1725, 65 S. Ct. 1384 (1945); *Lloyd Garretson Co. v. Robinson,* 178 Wash. 601, 35 P.2d 504 (1934).

■ Appellants argue that because foreign insurance companies are classified separately and treated differently than domestic insurance companies in some respects by the act, this difference in treatment denies to them the equal protection of law, guaranteed by the United States and Washington State Constitutions. Equal protection of the laws means the protection of equal laws. *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 30 L. Ed. 220, S. Ct. 1064 (1886); *Herriott v. Seattle,* 81 Wn.2d 48, 500 P.2d 101 (1972). It

forbids all invidious discrimination but does not require identical treatment for all without recognition of difference in relevant circumstances. The Fourteenth Amendment was not "designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State . . . Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good." *Barbier v. Connolly*, 113 U.S. 27, 31, 32, 28 L. Ed. 923, 5 S. Ct. 357 (1885); *Ketcham v. King County Medical Serv. Corp.*, 81 Wn.2d 565, 502 P.2d 1197 (1972).

We find a rational basis for the difference in treatment between foreign and domestic insurance companies under this act. As to the differences in insurance coverage under the act, the State of Washington cannot exercise jurisdiction in insurance matters beyond its territorial boundaries. Any attempt to do so would run afoul of both the commerce clause[7] and the McCarran Act.[8] As to remedies under the act, no assumption, reinsurance or guarantee of an existing policy could be effected without a transfer of the reserves to the insurance company with whom the insurance policy was reinsured or guaranteed, or who assumed the obligation.

The legislature could have determined that because foreign insurance companies' assets are outside the jurisdiction of the State of Washington, the Guaranty Association would be powerless to effectuate an assumption, reinsurance or guarantee of such policies. As we stated earlier, it is not the function of this court in the exercise of judicial review to second-guess the wisdom of legislative determinations. We are constrained to determine whether there is a rational basis for a legislative distinction between parties

[7]U.S. Const. art. 1, § 8 (clause 3).
[8]15 U.S.C. § 1011, *et seq.*

affected by a legislative act. A rational basis need not be the best basis for legislative distinction, it need only be a rational one in order to preserve the constitutionality of a legislative act. Having found a rational basis for the difference in remedies under the act, this court may not inquire further.

There is likewise a rational basis for the requirement that a majority of the Guaranty Association's board of directors be domestic insurance companies. As a practical matter it is easier to convene a quorum of the board to conduct the Guaranty Association's business where a majority of board members are insurance companies domiciled in Washington. While we may take judicial notice of the fact that modern-day travel accommodations make it less burdensome to travel great distances to attend and participate in board meetings, it is nonetheless arguable that the close geographical proximity of domestic insurers in the state of Washington further enhances effective board action.

Although the equal protection clauses in both the United States and Washington State Constitutions require laws of like application to all similarly situated, the legislature is allowed a wide discretion in the selection of classes. *Barrett v. Indiana*, 229 U.S. 26, 57 L. Ed. 1050, 33 S. Ct. 692 (1913); *Sparkman & McLean Co. v. Govan Inv. Trust*, 78 Wn.2d 584, 478 P.2d 232 (1970). Where, as here, no suspect classifications are involved, a classification will not render a state statute unconstitutional so long as it has a reasonable basis. *Watson v. Maryland*, 218 U.S. 173, 54 L. Ed. 987, 30 S. Ct. 644 (1910); *State ex rel. O'Brien v. Towne*, 64 Wn.2d 581, 392 P.2d 818 (1964). Its validity does not depend upon scientific or marked differences in things, their interrelations, or upon an observation that another classification scheme, such as the "Model Act" espoused by appellants, would be better. It suffices if the classification is reasonable and practical. *Orient Ins. Co. v. Daggs*, 172 U.S. 557, 43 L. Ed. 552, 19 S. Ct. 281 (1869); *Clifford v. State*, 78 Wn.2d 4, 469 P.2d 549 (1970). While a state legislature may not

arbitrarily select certain individuals for the operation of its statutes, a selection offends the equal protection clause only if it is clearly and actually arbitrary and not merely possibly so. *Bachtel v. Wilson*, 204 U.S. 36, 51 L. Ed. 357, 27 S. Ct. 243 (1907); *Frost v. Corporation Comm'n*, 278 U.S. 515, 73 L. Ed. 483, 49 S. Ct. 235 (1929); *Smith v. Cahoon*, 283 U.S. 553, 75 L. Ed. 1264, 51 S. Ct. 582 (1931).

Counsel for appellants argue that the legislative classifications in the "Model Act" provide broader coverage for foreign insurers and urge that this court find the classifications in the act before it deficient accordingly. We find no doctrinaire requirement that legislation should be couched in all-embracing terms. *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 81 L. Ed. 703, 57 S. Ct. 578, 108 A.L.R. 1330 (1937). The legislature is free to recognize degrees of harm, and a law which corrects one deficiency will not be overthrown merely because there may be other instances to which it might have been applied. *West Coast Hotel Co. v. Parrish, supra.*

## II
### Due Process

Appellants next argue that, assuming their property is not taken by way of taxation, the assessments authorized by the act constitute an unconstitutional taking of property without due process of law. Appellants' property, they argue, is being taken for distribution to others in satisfaction of another company's debts. In essence, appellants contend that the due process clauses of the Washington and United States Constitutions dictate that this court should void a legislative measure purposed, under the state's police power, to achieve what was, in the legislature's view, a necessary ambit of economic regulation. We decline to do so.

Over the years the judicial intrusion of the due process clause upon state statutes enacting economic regulation under a state's police power has had an uncertain and mercurial history. In the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 81, 21 L. Ed. 394 (1873), the due process

clause of the Fourteenth Amendment was invoked by a group of butchers challenging the validity of a Louisiana statute which conferred upon one corporation the exclusive privilege of butchering cattle in New Orleans. There the court said that "under no construction of [the due process clause] that we have ever seen, or any that we deem admissible, can the restraint imposed by the State of Louisiana upon the exercise of their trade by the butchers of New Orleans be held to be a deprivation of property within the meaning of that provision."

Eleven years following the decision in the *Slaughter-House Cases,* the United States Supreme Court in *Hurtado v. California,* 110 U.S. 516, 536, 28 L. Ed. 232, 4 S. Ct. 111 (1884), presciently declared that, "the limitations imposed by our constitutional law upon the action of the governments, both State and national, are essential to the preservation of public and private rights, notwithstanding the representative character of our political institutions. The enforcement of these limitations by *judicial process* is the device of self-governing communities to protect the rights of individuals and minorities, as well against the power of numbers, as against the violence of public agents transcending the limits of lawful authority, *even when acting in the name and wielding the force of the government."* (Italics ours.)

The Supreme Court was persuaded to dismiss its fears of upsetting the balance in the distribution of powers under the federal system and to enlarge its own supervisory powers over state legislation by appeals increasingly addressed to it for protection of property rights against remedial social legislation which the states were enacting with dispatch in the wake of industrial expansion.

The judicial intrusion of the due process clause upon a state's police power reached its acme in *Mugler v. Kansas,* 123 U.S. 623, 31 L. Ed. 205, 8 S. Ct. 273 (1887), only 24 years after the *Slaughter-House Cases,* where the court defined the police power as embracing no more than the power to promote public health, morals and safety. In *Loan*

*Ass'n v. Topeka,* 87 U.S. (20 Wall.) 655, 22 L. Ed. 455 (1875), ideas embodying the social compact and natural rights, which had been espoused by Justice Bradley in dissent in the *Slaughter-House Cases,* had been transformed tentatively into constitutionally enforceable limitations upon legislatures.

Next in the development of the due process doctrine, the court engrafted currently fashionable theories of *laissez-faire* economics onto its natural rights theories of liberty and property to the end that "liberty," in the particular, became synonymous with governmental hands-off in the field of private economic regulations such as that which the act here before us embraces. In *Budd v. New York,* 143 U.S. 517, 551, 36 L. Ed. 247, 12 S. Ct. 468 (1892), Justice Brewer declared in dictum that "[t]he paternal theory of government is to me odious. The utmost possible liberty to the individual, and the fullest possible protection to him and his property, is both the limitation and duty of government." To implement this point of view the court sought to erode the accepted maxim that a state statute must be presumed valid unless clearly shown to be otherwise. *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L. Ed. 162 (1810). *Mugler v. Kansas, supra,* accomplished this with its principle of judicial notice which carried with it the inference that unless the court, independently of the record, is able to ascertain the existence of justifying facts accessible to it by the rules governing judicial notice, it will be obliged to invalidate a police power regulation as bearing no reasonable or adequate relation to the purposes to be subserved by the police power—namely, the narrowly viewed purpose to promote health, morals or safety.

■ Eighty-two years after the *Slaughter-House Cases,* the Supreme Court came full circle, reconsidering its intervening cases where the due process clause had been invoked to render nugatory legislative attempts through the police power at economic regulation. In *Williamson v. Lee Optical,* 348 U.S. 483, 488, 99 L. Ed. 563, 75 S. Ct. 461 (1955), Justice Douglas, speaking on behalf of the court,

declared that "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. . . . We emphasize again what Chief Justice Waite said in *Munn v. Illinois,* 94 U.S. 113, 134, [24 L. Ed. 77], 'For protection against abuses by legislatures the people must resort to the polls, not to the courts.' " Eight years later in *Ferguson v. Skrupa,* 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028, 95 A.L.R.2d 1347 (1963), the court sustained, as a permissible exercise of legislative discretion, a state statute prohibiting the operation of a "debt adjusting" business except as incident to the legitimate practice of law without even attempting an appraisal, on the merits, of the validity of the state law which it upheld. There the court announced that it was returning "to the original constitutional proposition," enunciated in *Munn v. Illinois,* 94 U.S. 113, 24 L. Ed. 77 (1877), "that courts do not substitute their . . . economic beliefs for the judgment of legislative bodies . . ." *Ferguson v. Skrupa, supra* at 730.

This unfortunate history of the due process clause in the United States Supreme Court presents to this court a sobering lesson in the necessity for judicial deference to the legislature in the exercise of its police power to accomplish economic regulation.

Were we to accept appellants' invitation to void the act here on substantive due process grounds, we would set a precedent for embarking upon a course already traveled and finally rejected by the United States Supreme Court.

■ Appellants also argue that even if the act is constitutional on its face, it is unconstitutionally applied here because the assessments based upon premiums received by appellants in 1970, before the effective date of the act, amount to unconstitutional retroactive taxation. For reasons which we discuss *infra,* we hold that the assessments under the act are not taxes. An insurer doing business in Washington on the effective date of the act knew that if it

wanted to continue to do business in this state, it would have to be a member of the association and perhaps pay an assessment if a fellow-insurer was ordered into liquidation. The premiums of appellants earned in 1970 are not retroactively "taxed." Those 1970 premiums are simply an antecedent fact which the statute draws upon in its prospective operation. "A statute is not retroactive merely because it draws upon antecedent facts for its operation." *Bates v. McLeod,* 11 Wn.2d 648, 654, 120 P.2d 472 (1941). The utilization of data or facts antedating the effective date of a statute in a prospective operation of that statute does not render the legislation retroactive. *State v. Malone,* 9 Wn. App. 122, 511 P.2d 67 (1973).

Appellants further contend that the act is unconstitutional as applied to the long-standing and preexisting claims and insolvency of FOL. FOL, appellants argue, was statutorily insolvent in the insurance sense since at least 1967. In such a case, they say, this act was intended as remedial legislation by the legislature to remedy an already known preexisting insolvency and, hence, is unconstitutional. We disagree. Under the act no assessments are made and no relief is provided for the policyholders of an insurer until after the insurer has been ordered liquidated. As to FOL, an order of liquidation was made by the superior court more than 6 months after the effective date of the act. Since the precipitating event for the application of the act to policyholders of FOL, an order of liquidation, did not occur until after the effective date of the act, its application to FOL policyholders was prospective. A statute operates prospectively when the precipitating event for the application of the statute occurs after the effective date of the statute, even though the precipitating event had its origin in a situation existing prior to the enactment of the statute. *State ex rel. Am. Sav. Union v. Whittlesey,* 17 Wash. 447, 50 P. 119 (1897).

### III
#### *Formation of Corporation by Special Laws*

Appellants next argue that the act and the creation of

the association was in violation of the Washington State Constitution which prohibits the formation of corporations by special laws.[9] They contend that the association is the creature of a special act. We do not agree.

The source of the prohibition denying the grant of corporate powers and privileges to public or private corporations by private or special laws, found in the Washington State Constitution, article 2, section 28, is an amendment to the Wisconsin Constitution, article 4, section 31 (1871). *The Journal of the Washington State Constitutional Convention 1889*, 542 (1962). In *Madison Metropolitan Sewerage Dist. v. Stein*, 47 Wis. 2d 349, 177 N.W.2d 131 (1970), the Wisconsin Supreme Court, quoting with approval its earlier decisions in *State ex rel. La Follette v. Reuter*, 36 Wis. 2d 96, 153 N.W.2d 49 (1967) and *Kimball v. Rosendale*, 42 Wis. 407 (1877), discussed the historical objective and purpose of article 4, section 31 of the Wisconsin constitutional provision which, so far as the granting of corporate powers and privileges is concerned, is identical to that of article 2, section 28(6) of the Washington Constitution: " ' "the amendment of 1871 was adopted; in order, so far as it went, to confine legislation to its legitimate objects, to substitute general for special enactments, and to restore order and uniformity to municipal law." *Madison Metropolitan Sew-*

---

[9]Const. art. 11, § 10 (amendment 40):

"Corporations for municipal purposes shall not be created by special laws . . ."

Const. art. 12, § 1:

"CORPORATIONS, How FORMED. Corporations may be formed under general laws, but shall not be created by special acts."

Const. art. 12, § 5:

"TERM 'CORPORATION,' DEFINED — RIGHT TO SUE AND BE SUED. The term corporations, as used in this article, shall be construed to include all associations . . . having any powers or privileges of corporations not possessed by individuals or partnerships . . ."

Const. art. 2, § 28:

"SPECIAL LEGISLATION. The legislature is prohibited from enacting any private or special laws in the following cases:

". . .

"6. For granting corporate powers or privileges."

*erage Dist. v. Stein, supra* at 358. The *Madison* court went on to emphasize, at page 359, that:

"It is not required that all general laws shall be equally general. A law legislating for a class is a general law when it is for a class 'requiring legislation peculiar to itself in the matter covered by the law.' A law relating to particular persons or things *as a class* is said to be general; while a law relating to particular persons or things *of a class* is deemed special and private. Whether such laws are to be deemed general laws or special laws depends very much upon whether the classification is appropriate. (Emphasis supplied.) ["]

■ We have stated the difference between a special law and a general law as:

"A law is special in a constitutional sense when, by force of an inherent limitation, it arbitrarily separates some persons, places or things from others upon which, but for such limitation, it would operate. The test of a special law is the appropriateness of its provisions to the objects that is excludes. *It is not, therefore, what a law includes that makes it special, but what it excludes. If nothing be excluded that should be contained the law is general. Within this distinction between a special and a general law the question in every case is whether any appropriate object is excluded to which the law, but for its limitations, would apply. If the only limitation contained in a law is a legitimate classification of its objects it is a general law.*

(Italics ours.) *YMCA v. Parish,* 89 Wash. 495, 498, 154 P. 785 (1916).

■ Since we have earlier in this opinion found that the legislative classifications found in the guaranty act have a legitimate and reasonable basis, we are compelled by the reasoning in *YMCA v. Parish, supra,* to hold that the act here before us is not a special act and grants no corporate powers or privileges by special act to any entity.[10]

---

[10]In *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 199, 117 P. 1101 (1911), this court said: " 'Let us once hold that the legislature could not compel any citizen to submit to a burthen, except for the benefit of the state aggragate, or for some subdivision of it, as a county, city or town, or to pay any money except it shall go into the state or

## IV
### *Lending State's Credit or Taxing for a Private Purpose*

■ Appellants also contend the nature of the assessments authorized by the act amount to an unconstitutional taxation. We find the assessments were not a tax and, therefore, not an unconstitutional tax. The assessments made under the act were not state revenue funds. They did not redound to the benefit of any state or municipal treasury. Rather, they were trust funds assessed by a private association to be retained in private bank accounts to carry out the purpose of the act. This court has characterized assessments under the industrial insurance act, saying that "it is manifest that it is not a tax in the sense that the word is used in the sections of the constitution to which reference is here made. No accession to the public revenue, general or local, is authorized or aimed at. The purpose of the exaction is entirely different. It is to be used, not to meet the current expenses of government but to recompense employees of the industries on whom the burden is imposed for injuries received by them while engaged in the pursuit of their employment." *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 203, 117 P. 1101 (1911). Our disposition of this issue forecloses appellants' other arguments premised on the assessments being a tax.

Appellants make two remaining arguments. First, they argue that the act, by virtue of the mechanics of its operation, amounts to an unconstitutional impairment of contract rights.[11] In essence, their argument is that when their 1970 contracts of insurance were written they had not contemplated nor adjusted their premiums to anticipate potential

some subordinate public treasury, and we should soon find ourselves on the brink of anarchy itself—we should tie up the hands of the legislature it is true, so that they might not do some evils which they have hitherto had the power of doing; but we should also let loose upon society ten thousand evils, which in every well regulated community it has always been the duty of the legislature to suppress.' " We reaffirm this principle of deference to the legislature in matters of economic regulation enacted under this state's police power.

[11]Const. art. 1, § 23; U.S. Const. art. 1, § 10; U.S. Const. amend. 14.

assessments that might be levied against them under an act which was not effective until 1971. They argue that their obligations under those 1970 contracts are now fixed and not renegotiable with their insureds and that an assessment made against them in 1972, on the basis of the 1971 act, which is proportional to their 1970 premiums unconstitutionally impairs the value of those earlier contracts. We disagree.

■■■ "The obligations of a contract," observed Chief Justice Hughes for the court in *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 431, 78 L. Ed. 413, 54 S. Ct. 231, 188 A.L.R. 1481 (1934), "are impaired by law which renders them invalid, or releases or extinguishes them . . . and impairment . . . has been predicated of laws without destroying contracts derogate from substantial contractual rights." However, he adds that,

> [n]ot only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while, —a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court."

*Home Bldg. & Loan Ass'n v. Blaisdell, supra* at 435.

The *Blaisdell* decision manifests a realistic appreciation of the fact that ours is an evolving society and that the general words of the contract clause were not intended to reduce the legislative branch of government to helpless impotency.

Furthermore, we take judicial notice of the fact that appellants, all of whom by their own voluntary choice continue to sell insurance in this state, may be expected, within limits, to reflect the cost to them of these assess-

ments in premiums for insurance now being sold, thereby minimizing the effect of these assessments upon them.

Finally, appellants argue that the act unconstitutionally delegates legislative authority to an entity not a public body in violation of article 2, section 1 (amendment 7) of the Washington State Constitution. We do not agree.

The act before us provides adequate standards and guidelines defining generally what is to be accomplished, how, when and by whom. The association is not a "public body" but is a private, nonprofit association created under the police powers to fulfill a needed public purpose, "the protection of the general welfare." RCW 48.32A.010. The association does not legislate but is vested only with authority to render sound business judgments. The authority to make a decision as to whether the association shall assume, reinsure or guarantee insurance contracts, whether, when and how much to assess individual member insurance companies who themselves as a result of such assessment could become insolvent, depends upon many complicated factors, and such discretion as the act gives the association to exercise its business judgment in these areas is proper and is not a delegation of legislative authority. *Bowles v. Willingham,* 321 U.S. 503, 88 L. Ed. 892, 64 S. Ct. 641 (1944).

Affirmed.

HALE, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, STAFFORD, WRIGHT, and BRACHTENBACH, JJ., concur.