

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE___MAR 1 4 2013
~~Madsen, C.J.~~
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on March 14, 2013

~~Susan Carlson Deputy~~
for Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Estate of | ) | No. 86412-8 |
| | ) | |
| JAMES W. HAVILAND, | ) | En Banc |
| | ) | |
| Deceased. | ) | Filed ___ MAR 1 4 2013 |

MADSEN, C.J.—During the pendency of a will contest involving Dr. James Haviland's estate, the legislature amended the slayer statutes to disinherit those who financially abuse vulnerable adults. In light of the amendments, the administrator of the Haviland estate requested the trial court to determine whether Mary Haviland should be disinherited based on her conduct as found by the trial court. The trial court determined that the abuser statutes could not be applied to deny Ms. Haviland benefits from the Haviland estate because the statutes are triggered by financial abuse, which would require improper retroactive application of the statutes. The Court of Appeals reversed and remanded for further proceedings, holding that the petition filed during probate to adjudicate whether an individual is an abuser is the triggering event for application of the statutes and that the statutes acted prospectively as applied to this estate. We affirm the

Court of Appeals and hold that the abuser statutes act prospectively and that the filing of the abuser petition during probate triggers the statutes.

## FACTS

Dr. James Haviland was a medical doctor practicing in the Seattle area. For several decades, he was married to Marion Haviland, with whom he had four children. She died in 1993 and much of their estate was put into a living trust for the benefit of Dr. Haviland and his children and grandchildren upon his death. Three years later, Dr. Haviland, then 85, met 35-year-old Mary Haviland (then Mary Burden) who worked at Providence Hospital where he was a patient. Following Dr. Haviland's discharge, he and Ms. Burden began dating and he agreed to pay $100,000 toward her education and an additional $300,000-$350,000 for a "nest egg." Clerk's Papers (CP) at 13.

Dr. Haviland and Ms. Burden married in 1997. The day before their marriage, Dr. Haviland changed his will to include Ms. Burden and revised it several more times during their marriage in 1998, 2002, and 2006. The 2006 will authorized Dr. Haviland's total probate estate to pass to Ms. Haviland, with the exception of specific bequests of $55,000, only leaving his children the right of first refusal to purchase his property on Shaw Island if Ms. Haviland decided to sell it. The will also directed that Ms. Haviland would be one of the estate's personal representatives. During the marriage, Dr. Haviland also amended his living trust and transferred securities for Ms. Haviland's benefit, and made large cash gifts to her family members. Additionally, large sums were transferred from their joint checking account to Ms. Haviland's separate account.

2

Dr. Haviland suffered advanced dementia at the end of his life; however, it is unclear if he suffered the condition during the signing of the 2006 will. He died in November 2007. The 2006 will was admitted to probate the following month.

In April 2008, three of Dr. Haviland's children commenced an action challenging the 2006 will, alleging that Dr. Haviland lacked testamentary capacity and that the will was the product of undue influence by Ms. Haviland. They also sought removal of Ms. Haviland as copersonal representative of the estate under RCW 11.36.010 because of her ineligibility due to past criminal convictions. In May, Ms. Haviland resigned as copersonal representative, and a week later the court also granted the petition to remove her as the representative. The trial court found that "the lifetime Estate of Dr. Haviland was so depleted by Mary's transfer of funds that, after distribution of specific bequests, the total value of the Estate is a negative $45,834.38." CP at 36. The court invalidated the 2006 will, finding by clear, cogent, and convincing evidence that the will was the product of undue influence by Ms. Haviland. The court also awarded attorney fees to the petitioners, paid from Ms. Haviland's share of the probate and nonprobate assets of the estate, and appointed Richard Furman as administrator of the estate.

Ms. Haviland appealed the trial court's ruling to the Court of Appeals. The court affirmed, determining that the trial court correctly analyzed the undue influence claim and that there was substantial evidence from the record supporting the trial court's written findings of fact and conclusions of law. *In re Estate of Haviland*, 162 Wn. App. 548, 569, 255 P.3d 854 (2011).

While the will challenge was pending, the legislature amended the slayer statutes, extending the statutes' application to prevent financial abusers of vulnerable adults from acquiring property or any benefit from their victims' estates.[1] LAWS OF 2009, ch. 525, codified in chapter 11.84 RCW, RCW 26.16.120, RCW 41.04.273, and RCW 11.96A.030. In light of this change, Furman, as administrator, filed a petition to determine whether Ms. Haviland engaged in a pattern of transferring assets from Dr. Haviland's estate for her and her designees' benefit, constituting financial exploitation sufficient for application of chapter 11.84 RCW.

The trial court denied the petition, concluding that the triggering event for application of the statutes was the financial exploitation of Dr. Haviland. The court noted the effective date of the statute was July 26, 2009, and declined to apply the statute retroactively. The Court of Appeals reversed. *In re Estate of Haviland*, 161 Wn. App. 851, 858, 251 P.3d 289 (2011). The court concluded that the triggering event for applying the statutes was the filing of the petition during probate to declare a person an abuser. Thus, any application of the abuser statutes in the Haviland probate would not constitute a retroactive application. *Id.* at 851. It remanded the matter to the trial court to determine whether the trial court's findings of financial exploitation were sufficient to determine that Ms. Haviland was an abuser for purposes of the statutes. *Id.* We granted

---

[1] "No slayer or abuser shall in any way acquire any property or receive any benefit as the result of the death of the decedent, but such property shall pass as provided in the sections following." RCW 11.84.020. An abuser is "any person who participates, either as a principal or an accessory before the fact, in the willful and unlawful financial exploitation of a vulnerable adult." RCW 11.84.010(1).

Ms. Haviland's petition for review. *In re Estate of Haviland*, 173 Wn.2d 1001, 268 P.3d 941 (2011).

## ANALYSIS

Resolution of this case requires that we determine the triggering event for applying the financial abuse prong of the amended slayer statutes.[2] The estate and Dr. Haviland's children contend that the legislature intended the statutes to act prospectively and that the filing of the abuser petition during probate is the triggering event for applying the statutes. Ms. Haviland agrees that the statutes must be applied prospectively; however, she argues that the date of the decedent's death is the triggering event. Thus, she contends that applying the statutes in this case would be an improper retroactive application. She also argues that application of the statutes would impair her vested rights, in violation of due process protections. To resolve this issue, we turn to the plain language of the statutes and applicable case law.

We review questions of statutory interpretation de novo. *Jackowski v. Borchelt*, 174 Wn.2d 720, 729, 278 P.3d 1100 (2012). A statute has retroactive effect when the precipitating event under the statute occurred before the statute's enactment. *In re Pers. Restraint of Carrier*, 173 Wn.2d 791, 809, 272 P.3d 209 (2012); *State v. Belgarde*, 119 Wn.2d 711, 722, 837 P.2d 599 (1992). A statute may also act retroactively when it takes away or impairs vested rights, or imposes new duties or disabilities in respect to past

---

[2] Both parties allude to concerns over the application of the abuser statutes to nonprobate assets; however, our decision is limited to the triggering event of these statutes. The scope of the abuser statutes to nonprobate assets is a question that is not before this court and may be addressed by the trial court if Ms. Haviland is deemed an abuser.

transactions; however, a statute is not retroactive "'merely because it relates to prior facts or transactions where it does not change their legal effect. It is not retroactive because some of the requisites for its actions are drawn from a time antecedent to its passage or because it fixes the status of a person for the purposes of its operation.'" *State v. Varga*, 151 Wn.2d 179, 195, 86 P.3d 139 (2004) (quoting *State v. Scheffel*, 82 Wn.2d 872, 879, 514 P.2d 1052 (1973)); *State v. Pillatos*, 159 Wn.2d 459, 471, 150 P.3d 1130 (2007) (citing *Pape v. Dep't of Labor & Indus.*, 43 Wn.2d 736, 740-41, 264 P.2d 241 (1953)). Conversely, "[a] statute operates prospectively when the precipitating event for the application of the statute occurs after the effective date of the statute, even though the precipitating event had its origin in a situation existing prior to the enactment of the statute." *Aetna Life Ins. Co. v. Wash. Life & Disability Ins. Guaranty Ass'n*, 83 Wn.2d 523, 535, 520 P.2d 162 (1974); *In re Estate of Burns*, 131 Wn.2d 104, 110-11, 928 P.2d 1094 (1997). Statutes are presumed to apply prospectively, absent contrary legislative intent. *Burns*, 131 Wn.2d at 110.

We look to the subject matter regulated by the statute and consider its plain language to determine the precipitating or triggering event. *Carrier*, 173 Wn.2d at 809 (citing *State v. T.K.*, 139 Wn.2d 320, 330, 987 P.2d 63 (1999)); *Burns*, 131 Wn.2d at 112. "The court's fundamental objective is to ascertain and carry out the Legislature's intent, and if the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

The abuser statutes regulate the receipt of benefits. This is evidenced by the language in RCW 11.84.020 that "[n]o slayer or abuser shall in any way acquire any property or receive any benefit as the result of the death of the decedent" and in RCW 11.84.900, which states that "no person shall be allowed to profit by his or her own wrong, wherever committed." The language plainly seeks to prevent a financial abuser from receiving any property or other benefit from a decedent's estate. While the slayer statutes will disincentivise abuse, deterrence for the commission of these acts exists elsewhere in the code, under the criminal statutes for murder and the vulnerable adult protection act, chapter 9A.32 RCW and chapter 74.34 RCW. Indeed the financial abuse slayer statutes only affect those persons who both abuse a vulnerable adult *and* are beneficiaries of the abused person.

For the statutes' purpose to be effectuated, they must be applied to prevent distribution of property and other benefits to a financial abuser. When the victim's estate is subject to probate, the probate proceeding, not the decedent's death, clears title and results in distribution of the assets. Distribution of assets that pass outside of probate may also be challenged when there is a claim that distribution of property or other benefits is prevented under the slayer statute.[3] In either case, there must be a determination made about whether a slaying or financial exploitation of a vulnerable adult bars acquisition of a decedent's property or other benefits. It is the challenge to

---

[3] *See, e.g.*, RCW 41.04.273 (explaining process for which property that would have passed to or from one of the retirement systems listed in RCW 41.50.030 is distributed when the beneficiary was a slayer or abuser of the decedent).

7

property distribution based on abuse that triggers application of the statute, even though the abuse itself occurred in the past.

RCW 11.84.900 provides that the slayer and abuser chapter is to be "construed broadly" so that "no person shall . . . profit by his or her wrong." The definition of a "decedent" under that chapter also contains no limitations, stating that a decedent is one who "at any time during life in which he or she was a vulnerable adult, was the victim of financial exploitation by an abuser." RCW 11.84.010(2)(b). Viewing the filing of a petition challenging distribution based on financial abuse as the triggering event best effectuates the statutes' stated goal of broad application.

It is also significant that the legislature did not specify an effective date for application of the financial abuse amendments, particularly when contrasted with other provisions within Title 11 RCW, which *do* state effective dates and application terms. *See, e.g.*, RCW 11.11.901 (application of the chapter to any will of an owner who dies while a state resident on or after July 1, 1999, regardless of the date of execution or republishing, and regardless of when the beneficiary was designated); *see also* RCW 11.20.020 ("Effective date -- Application -- 1977 ex.s. c 234: 'This 1977 amendatory act shall take effect on October 1, 1977 and shall apply to all proceedings in probate with respect to decedents whose deaths occurred after the effective date.'"). These provisions demonstrate that the legislature is capable of expressing a triggering event and has done so in the past. Its decision not to do so here further supports broad application of the abuser statutes.

Our conclusion is consistent with existing case law, which demonstrates that the proper triggering event is that which the statute intends to regulate. *See Belgarde*, 119 Wn.2d at 722 (constitutional amendment authorizing a retired judge to hear cases pending before his retirement is triggered by the retirement of a judge with pending cases, not the cases themselves). In *Burns*, 131 Wn.2d at 105, the court was required to determine the precipitating event for statutory amendments relating to the state's ability to recover medical benefits from a person's estate, where the benefits were received prior to the effective date of the statute authorizing recovery of the benefits. We considered the plain language of the statute to determine the activity that the provision regulated and held that the precipitating event was the receipt of benefits giving rise to indebtedness because the statute regulated the collection of debt and not the creation of the decedent's estate. *Id.* at 115. Thus, the state's attempt to apply the amendment to recover earlier benefits constituted an improper retroactive application. *Id.* at 120.

Similarly, in *Aetna*, 83 Wn.2d at 525-26, we considered an act that required insurers to become members of a guaranty association and pay an assessment if another insured received a liquidation order. There, the insurers contended that the state unconstitutionally applied the statute retroactively when it collected assessments on premiums received before the statute's enactment. *Id.* at 534. We determined that the liquidation order was the precipitating event, rather than the insolvency or receipt of premiums, since no assessments were made or relief provided until after a liquidation order. *Id.* at 535. Here, the abuser statutes intend to regulate the receipt of benefits, not

the financial abuse itself. Thus, despite the fact that abuse occurred prior to the amendments at issue, the triggering event is the attempt by the abuser to receive property or any other benefit from the estate of the abused person.

Ms. Haviland argues, however, that the statutes act retroactively when applied to this estate because, she says, vested rights are impaired. *In re Pers. Restraint of Flint*, 174 Wn.2d 539, 547-48, 277 P.3d 657 (2012) ("A statute has retroactive effect if it takes away or impairs a party's vested rights acquired under existing laws. The same is true if a statute's application increases liability for past conduct or imposes new duties or disabilities with respect to completed transactions." (citations omitted)).

We disagree. A vested right is more than a mere expectation. *Carrier*, 173 Wn.2d at 811. In *Carrier*, we said that to vest, the right "'must have become a title, legal or equitable, to the present or future enjoyment of property, a demand, or a legal exemption from a demand by another.'" *Id.* (quoting *Godfrey v. State*, 84 Wn.2d 959, 963, 530 P.2d 630 (1975)). For example, in *State v. Varga*, 151 Wn.2d 179, 197, 86 P.3d 139 (2004), we considered whether a defendant had a vested right in the "washed out" status of his prior convictions when the legislature amended the Sentencing Reform Act of 1981, chapter 9.94A RCW, to require courts to include these offenses in the offender score calculation. While distinguishing another case involving vested rights, we said:

> Unlike T.K., Varga could not exercise his alleged "right" to the "washed out" status of his prior convictions until he committed a new offense. T.K. on the other hand could have moved the court to expunge his juvenile adjudication under the former version of RCW 13.50.050(11). Given that Varga's ability to exercise his right depended on his commission

of a new offense, we cannot conclude that Varga is entitled to the same protections as T.K.

*Varga*, 151 Wn.2d at 197. We held that Varga had no vested right to a "wash out" of his prior conviction because whether the offense "washed out" depended on whether Varga committed a crime in the future. *Id.* at 197-98. Applying this rationale to the case at hand, Ms. Haviland's right in her deceased husband's property depends upon the outcome of probate proceedings and whether there are claims of fraud, undue influence, creditor claims, or other challenges. *See* RCW 11.04.250. Thus, prior to probate, Ms. Haviland's interest is not vested for purposes of determining retroactivity.

Our conclusion is also supported by the language of the descent and distribution statutes. For example, RCW 11.04.250 states that while title in real estate vests immediately in the heirs or devisees upon the death of the decedent, no person is a devisee until the will has been probated. Further, a probate order is conclusive *except* when there is a will contest. RCW 11.20.020. Accordingly, Ms. Haviland cannot inherit until probate has been completed.

This conclusion also follows from case law, which holds that while heirs have an interest in the property at death, that interest is subject to the administrator until the completion of probate. *See Wendler v. Woodard*, 93 Wash. 684, 685, 161 P. 1043 (1916) (citing *Gibson v. Slater*, 42 Wash. 347, 84 P. 648 (1906) (heirs take title immediately, but the administrator has the right of possession and recovery for the estate)); *see also In re Estate of Verchot*, 4 Wn.2d 574, 582, 104 P.2d 490 (1940) (heirs acquire a vested equitable right in the decedent's personal property, but only the interest in the estate

11

vests, not the title); *In re Estate of Peterson*, 12 Wn.2d 686, 734, 123 P.2d 733 (1942) ("Only after an estate has been closed can the heirs, by acquiring these additional rights in the property, become entitled to treat it as their own."); *In re Estate of Turner*, 191 Wash. 145, 150, 70 P.2d 1059 (1937) (noting that an estate vests immediately in an heir upon an ancestor's death, subject to creditors, and that there, the probate of the estate had been fully completed and the estate was "fully vested in the heirs and devisees" under the probate statute).

Even in the context of the slayer statute, several jurisdictions have noted that a slayer is not divested of property already acquired when he is prevented from inheriting from his victim. *See In re Estate of Blodgett*, 147 P.3d 702, 710 (Alaska 2006) (citing Mary Louise Fellows, *The Slayer Rule: Not Solely a Matter of Equity*, 71 IOWA L. REV. 489, 540 n.160 (1986), and discussing various court rationales for disallowing a slayer to profit from his victim where constitutional forfeiture clauses prevent a criminal from forfeiting his property to the state). The conclusion that a slayer is not deprived of property was also expressed by this court when a slayer sought property in lieu of a homestead award, prior to the enactment of the slayer statute. *In re Estate of Tyler*, 140 Wash. 679, 691, 250 P. 456 (1926) (saying that "[t]his property was not his, and he is not being deprived of it. He has sought to acquire it because of the crime he committed for the purpose of acquiring it. He had no vested right or interest in it").[4] Here, the abuser

_____

[4] Following *Tyler*, this court in *In re Estate of Duncan*, 40 Wn.2d 850, 853, 246 P.2d 445 (1952), allowed a slayer to inherit from the decedent, distinguishing *Tyler* on the grounds that it related to homestead statutes, not descent and distribution. *Duncan* reasoned that the legislation passed subsequent to *Tyler* did not imply a prohibition against inheritance, as it did for homesteads,

statutes do not have retroactive effect because only upon completion of probate would Ms. Haviland's interest be vested for this purpose.

Nor is Ms. Haviland faced with new consequences for past actions. Prior to Ms. Haviland's conduct, financial abuse of a vulnerable adult was regulated by the vulnerable adult protection act. RCW 74.34.110 (a vulnerable adult may seek relief from financial exploitation by filing a petition for a protection order), .145 (protection orders for vulnerable adults issued under this chapter shall bear a notice that violation with actual notice is a criminal offense under chapter 26.50 RCW, and violation of these orders are punishable under RCW 26.50.110), .200 (in addition to other remedies, a vulnerable adult subject to financial exploitation shall have a cause of action for damages). The vulnerable adult protection act thus provided notice that financial abuse is a wrongful act and that the financial abuser could be liable for the amount they improperly received.

Finally, we reject Ms. Haviland's argument that applying the financial abuse statutes in this case would violate the ex post facto clause. U.S. CONST. art. I, § 10; WASH. CONST. art. I, § 23. This clause pertains to criminal and penal statutes that punish past or future conduct. *State v. Schmidt*, 100 Wn. App. 297, 299, 996 P.2d 1119 (2000), *aff'd*, 143 Wn.2d 658, 23 P.3d 462 (2001). However, "the slayer statute is not a criminal statute. Its origins are in equity." *In re Estate of Kissinger*, 166 Wn.2d 120, 131, 206 P.3d 665 (2009). Likewise, the abuser statutes are civil and simply prevent one from

---

although this result did shock the court's conscience. *Id.* at 854. The court noted that it was only asked to construe descent and distributions statutes and concluded by inviting the legislature to act to avoid such a result in the future. *Id.*

profiting by his own wrongful actions. *Cf. Tyler*, 140 Wash. at 687 (citing *Perry v. Strawbridge*, 209 Mo. 621, 108 S.W. 641 (1908)).

In light of our holding that application of the financial abuse statutes in this case is not an improper retroactive application, we deny Ms. Haviland's motion for attorney fees and costs.

## CONCLUSION

We hold that the abuser statutes act prospectively as applied to this case and are triggered by the filing of the petition to declare a beneficiary an abuser. We affirm the Court of Appeals and remand to the trial court for further proceedings.

No. 86412-8

_Madsen, C.J._

WE CONCUR:

_____          _Stephens, J._

_Fairhurst, J._

_González, J._

15

*In re Estate of Haviland (James W.)*, No. 86412-8

No. 86412-8

CHAMBERS, J.* (dissenting)—More than a year after Dr. James W. Haviland's death, the legislature amended the slayer statute to disinherit many of those who financially abuse vulnerable adults. LAWS OF 2009, ch. 525. Based on that statutory change, Dr. Haviland's children seek to disinherit his wife. The majority holds that they may. I would hold the amendment is prospective and its triggering event is the death of the alleged vulnerable adult. Accordingly, I would hold the amendment does not apply to the facts of this case and reverse the Court of Appeals.

Dr. Haviland was born in 1911 and lived an accomplished life. Among many other things, he cofounded the Northwest Kidney Centers. Dr. Haviland had a long marriage with Marion Haviland. They had four children together. After Marion died in 1993, much of her estate was put into trust for the lifetime benefit of Dr. Haviland, to be distributed at his death to several charities, their children, and their grandchildren. Three years after Marion died, Dr. Haviland met Mary Burden who worked as a nurse's assistant at a facility where Dr. Haviland was treated. A romance developed and Dr. Haviland began advancing money to Mary Burden and then married her. Clerk's Papers (CP) at 13-14.[1]

---

*Justice Tom Chambers is serving as a justice pro tempore of the supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1]Mary Haviland was 35 years old and Dr. Haviland was 85 years old when they married.

1

After they married, Dr. Haviland revised his will several times. Each revision gave a larger portion of the estate to Mary Haviland and less to his children and charity. Ten years later, "the lifetime Estate of Dr. Haviland [which had exceeded three million dollars at the time he married Mary Burden] was so depleted by Mary's transfer of funds that after distribution of specific bequests, the total value of the Estate is a negative $45,834.38." CP at 14, 36. In September 2009, Judge John P. Erlick set aside the 2006 will as "the product of undue influence by Mary Haviland," canceled the letters testamentary, and appointed Richard Furman as an independent personal representative. CP at 38, 40, 174-75. The Court of Appeals affirmed. *In re Estate of Haviland,* 162 Wn. App. 548, 255 P.3d 854 (2011).[2] Neither party sought further review and the issue of undue influence is not before us.

Over a year after Dr. Haviland died, the Washington legislature amended the slayer statute to largely disinherit those who financially abuse vulnerable adults. LAWS OF 2009, ch. 525, codified mostly in chapter 11.84 RCW. The amendments became effective in July 2009. Not long after, the independent personal representative moved to disinherit Mary Burden Haviland. CP at 1. The real issue in this case is whether the legislation reaches back in time to cover conduct that occurred before the legislation was enacted.[3]

---

[2] The matter was remanded for further proceedings, is not before us, and may await the result of this review with the administrator offering the 2002 will for probate.

[3] "'Abuser'" is defined in the statute as "any person who participates, either as a principal or an accessory before the fact, in the willful and unlawful financial exploitation of a vulnerable adult." RCW 11.84.010(1). Trial judges are empowered to disinherit an abuser if they find "by clear, cogent, and convincing evidence that: (a) The decedent was a vulnerable adult at the time the alleged financial exploitation took place; and (b) The conduct constituting financial

2

The legislature's power is plenary, and it may, subject to constitutional constraints, pass retroactive legislation. *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 300-01, 174 P.3d 1142 (2007). But for good reason, we approach such claims with skepticism. "A retrospective law, in the legal sense, is one which takes away or impairs vested rights acquired in the existing laws, or creates a new obligation and imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Pape v. Dep't of Labor & Indus.*, 43 Wn.2d 736, 740-41, 264 P.2d 241 (1953) (citing 50 AM. JUR. *Statutes* § 476, at 492 (1944)).

In cases where a statute does not clearly articulate the triggering event, we attempt to determine the event that will best accomplish the legislature's intent within constitutional limitations. *State v. Belgarde*, 119 Wn.2d 711, 837 P.2d 599 (1992). I cannot find anything in the text or the legislative history of this act to suggest the legislature intended a retroactive application. While there is no explicit triggering event found in the financial abuser amendment, the legislature chose to place it within the slayer statute, where plainly, the triggering event is the slaying of the decedent.[4] It is also consistent with RCW 11.84.170, which provides that abusers are entitled to inherit if the abused person "[k]new of the financial exploitation; and . . . [s]ubsequently ratified his or her intent" to bequeath an estate.

---

exploitation was willful action or willful inaction causing injury to the property of the vulnerable adult," with certain exceptions not relevant to us today. RCW 11.84.160(1).

[4] I recognize that no case has explicitly found that the "the willful and unlawful killing of any other person" is in fact the triggering event for application of the pre-2009 slayer statute, but my review of the case law persuades me it is fairly implied. *See* RCW 11.84.010(5); *In re Estate of Kissinger*, 166 Wn.2d 120, 206 P.3d 665 (2009) (considering whether a finding of not guilty by reason of insanity barred inheritance under the slayer statute).

3

RCW 11.84.170(1)(a)-(b). Whether or not the abused person ratified an intent to bequeath the estate is not final until the person dies since, under most circumstances, the decedent can change the disposition of the estate up until the time of death. Fixing the triggering event as the date of death reduces uncertainty. Although will challenges, probate, and other proceedings may consume years, it is the death that fixes the rights determined by any petitions filed in those proceedings. The date of death is usually not subject to protracted factual inquiry as would the date of abuse. Finally, in my view, concluding the statute is triggered by the filing of the petition will, in some cases, place new consequences on completed acts, in violation of the principle that people are entitled to know the consequences of their actions before they take them. *See State v. Miller,* 156 Wn.2d 23, 29, 123 P.3d 827 (2005) (citing Oliver Wendell Holmes, *The Path of the Law,* 10 HARV. L. REV. 457, 459 (1897)).

The majority finds evidence of legislative intent in the long standing statutory admonition that "[t]his chapter shall be construed broadly to effect the policy of this state that no person shall be allowed to profit by his or her own wrong, wherever committed." RCW 11.84.900. But, with some tweaks over the years, that has been the law since 1955. LAWS OF 1955, ch. 141, § 14. This provision tells us little if anything about what the 2009 legislature intended.

The majority also finds some meaning in the fact that the legislature has, at least twice, announced an effective date in Title 11 RCW legislation. But an effective date is not a triggering event, and even if it were, what of it? The fact that the legislature from time to time feels stirred to announce an effective date

4

tells us nothing about what event might trigger the application of a statute that is silent on the subject. I cannot see why the legislature would not have been clearer if it intended the amendments to apply to pending cases. *In re Estate of Burns,* 131 Wn.2d 104, 110, 928 P.2d 1094 (1997) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)).

I cannot agree with the majority that Mary Haviland does not face new consequences for past actions based on the court's action today. True, it appears the legislature built on chapter 74.34 RCW, a chapter dedicated to protecting vulnerable adults, when expanding the slayer statute to disinherit financial abusers. I say "appears" because the bill report the Haviland children call to our attention does not cite chapter 74.34 RCW directly but refers to the "Abuse of Vulnerable Adults Act," which is a fair description of chapter 74.34 RCW. H.B. REP. on Substitute H.B. 1103, at 2, 67th Leg. Reg. Sess. (Wash. 2009). The bill report also substantially mirrors the definition of "'[v]ulnerable adult'" found in former RCW 74.34.020(16) (2010). *Id.* However, the "Abuse of Vulnerable Adults Act" does not appear in the Popular Names Table produced by the Statute Law Committee. No matter. Financial exploitation is broadly defined in chapter 74.34 RCW and certainly could include actions by one spouse to the detriment of the other. RCW 74.34.020(6).[5] However, chapter 74.34 RCW, at least as it applies to

---

[5] "'Financial exploitation'" includes, but is not limited to:
      (a) The use of deception, intimidation, or undue influence by a person or entity in a position of trust and confidence with a vulnerable adult to obtain or use the property, income, resources, or trust funds of the vulnerable adult for the benefit of a person or entity other than the vulnerable adult;
    . . . .

5

uncompensated spouses, *see* RCW 74.34.200, does not set forth a list of clearly identified prohibited conduct. Instead, relevantly, it creates a mechanism to bring potential abuse before a judge who is empowered to enter an appropriate protective order, the violation of which would be a criminal offense. RCW 74.34.130, .145. Only once the order is in place would a spouse have clear notice of what was prohibited. The remedies in chapter 74.34 RCW are also very different from the slayer statute. Chapter 74.34 RCW does not give clear notice that conduct like that proved here could become the basis of future disinheritance by operation of law. Something new happened in Laws of 2009, chapter 525, and if it is applied to Mary Haviland, something new will happen to her. She will be disinherited; a fact she could not reasonably have anticipated on the sad death of her husband.

I do not find that our cases lead us to the majority's conclusion, or in fact, to any useful conclusion. In *Belgarde*, we were asked to decide whether a constitutional amendment to article IV, section 7 of our state constitution that allowed retiring judges to finish pending cases as pro tem judges without the parties' consent applied to a pending trial. *Belgarde*, 119 Wn.2d 711. Relying upon the highly specific legislative history motivating the amendment, we found that the trial judge's retirement, not the commencement of proceedings, was the triggering event. *Id.* at 722-23. In *Burns*, 131 Wn.2d at 107, we considered whether amendments to chapter 43.20B RCW, that allowed the State to recover

---

(c) Obtaining or using a vulnerable adult's property, income, resources, or trust funds without lawful authority, by a person or entity who knows or clearly should know that the vulnerable adult lacks the capacity to consent to the release or use of his or her property, income, resources, or trust funds.

RCW 74.34.020(6).

6

some medical benefits from a person's estate, applied to benefits received prior to the effective date of the statute. Based on the statutory language, principles of fairness, and the general definitions of operative terms, we found that the "precipitating event" was the "receipt of the benefits." *Burns*, 131 Wn.2d at 115-16. And in *Aetna Life Insurance. Co. v. Washington. Life & Disability Insurance. Guaranty Ass'n*, 83 Wn.2d 523, 525, 520 P.2d 162 (1974), we were faced with a statute that created an insurer-funded guarantee fund to pay claims in the event of insurer insolvency. One insurer had become insolvent as a matter of fact prior to the effective date of the statute. *Id.* at 535. Several insurers had challenged the statute's constitutionality and applicability on a variety of grounds, including its alleged retroactivity. We rejected the constitutional challenges and concluded it was not the actual insolvency or receipt of premiums that triggered application of the statute. Instead, the statute was triggered by entry of a liquidation order against an insolvent insurer. *Id.* at 534-35. As that order had been entered after the effective date of the statute, it was not being applied retroactively. Taken together, *Belgarde, Burns,* and *Aetna* establish that the triggering or precipitating event may be the event that precipitates the evil the legislature intends to avoid, absent statutory indication otherwise.

The majority holds that the evil the legislature intends to avoid is the passing of an estate to a financial abuser. And there is textual support for the majority's conclusion. But that is a bloodless reason to pass legislation. It is plain to me that the true evil the legislature wished to end was elder abuse, not inheritance by unworthy heirs.

7

Finally, I am not as confident as the majority that Mary Haviland has no rights the law is bound to respect. Under the legal fiction of relation-back, all rights of inheritance are occasioned by the death of the decedent but are subject to being defeated by all manner of forces that may frustrate the heir's expectation. *See In re Estate of Baird*, 131 Wn.2d 514, 520, 933 P.2d 1031 (1997) (quoting *In re Estate of Graley*, 183 Wash. 268, 274, 48 P.2d 634 (1935)). Creditors' claims, will contests, market collapses, natural disasters–all these things could transform an estate from the time of death to the day the heir takes. Our law recognizes this. But it is a very different thing to hold the *legislature* can do something new to upset vested rights.

I would avoid this question today. I respectfully dissent.

Madsen, J.P.T.

Johnson, J.

Owens, J.

Wiggins, J.